**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA**

**Tallahassee Division**

KATE CALVIN, JOHN NELSON,
CHARLES J. PARRISH, LONNIE GRIFFIN
and CONCERNED UNITED PEOPLE,

        Case No.: 4:15-cv-00131-MW-CAS

    Plaintiffs,

vs.

JEFFERSON COUNTY BOARD OF
COMMISSIONERS, JEFFERSON COUNTY
SCHOOL BOARD, and MARTY BISHOP,
SUPERVISOR OF ELECTIONS, in his official
capacity,

    Defendants.

_____/

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT, AND IN OPPOSITION
TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

    Plaintiffs Kate Calvin, John Nelson, Charles J. Parrish, Lonnie Griffin, and Concerned United People (CUP), by and through counsel, hereby respectfully submit this Memorandum of Law in Opposition to Defendants' Joint Motion for Summary Judgment, and in support of Plaintiffs' Cross-Motion for Summary Judgment.

**INTRODUCTION**

    Plaintiffs are residents of Jefferson County, Florida, who are challenging Defendants' adoption of a redistricting plan that violates their rights under the Equal Protection Clause of the Fourteenth Amendment, namely the principle of "one person, one vote." Plaintiffs maintain that, by including the inmate population at Jefferson

1

Correctional Institution (JCI) in its final redistricting plan, Defendants artificially inflated the voting strength of those residents living in the district that houses the prison. Consequently, Defendants unconstitutionally diluted the voting strength of those residents living outside of the prison district, including the individual plaintiffs and CUP members.[1]

Under the redistricting plan Defendants enacted, the inmates at JCI constitute over one-third of the total population in the district at issue – District 3. Broken down even further, JCI inmates make up over 40% of the voting age population in District 3; and the overall deviation for the redistricting plan excluding the prison is **42.63%,** well over the constitutionally acceptable threshold of 10%. *See White v. Regester*, 412 U.S. 755, 764 (1973) (ruling that deviations less than 9.9% are presumptively constitutional). This means that residents of District 3 wield much more political influence than residents in each of the other four districts. Despite their weak attempts, Defendants have not pointed to a single law, statute or other legal authority to support such a flawed and substantially imbalanced redistricting plan.

In their summary judgment motion, Defendants mispresent Plaintiffs' claim as asking the Court to step into the role of legislator by determining which political decisions should impact the drawing of district lines for the County. The Defendants' assertion could not be further from the truth. Plaintiffs' Equal Protection claim is straightforward and based on the fact that the overwhelming majority of inmates at JCI are not residents of the County and do not enjoy the substantial benefits residency

---

[1] Organizational Plaintiff Concerned United People has standing on behalf of its members who are Jefferson County residents adversely affected by population equality defects of the 2013 Redistricting Plan. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167 (2000).

provides in Jefferson County. Yet, these inmates officially make up over 40% of the voting age population in District 3 and are being involuntarily used to maximize and concentrate political power in the hands of a few. The U.S. Constitution does not support such an abuse of legislative power, and Defendants should be required to redraw a plan that ensures equal representation for the actual residents of Jefferson County.

Because no material facts remain in dispute, Plaintiffs are entitled to judgment as a matter of law. Plaintiffs respectfully request that this Court deny Defendants' Motion for Summary Judgment, grant Plaintiffs' Cross-Motion for Summary Judgment, and enter a declaratory judgment for Plaintiffs.

## STATEMENT OF MATERIAL FACTS

Jefferson County is divided into five single-member districts for its Board of County Commissioners and School Board. Defs.' Joint Mot. Summ. J. (DE 24) at 3. The members of both boards serve four-year, staggered terms, with elections occurring every two years. *Id.* Board members are elected by voters from the individual district in which the commission or school board candidate lives. *Id.* Jefferson County is scheduled to have county commission and school board elections in 2016, and the candidate qualifying deadlines are June 20, 2016, and June 24, 2016.[2]

The Jefferson Correctional Institution (JCI) is located in Jefferson County, and the Florida Department of Corrections states JCI's address as 1050 Big Joe Road, Monticello, Florida 32344-0430.[3] Under the County's 2013 redistricting plan, the JCI is completely situated within District 3. Expert Report of William S. Cooper (Cooper

---

[2] *http://dos.myflorida.com/elections/candidates-committees/qualifying/*

[3] *http://www.dc.state.fl.us/facilities/region1/103.html*

Expert Report) at 11-13, attached as Ex. 1.  According to the 2010 Census data, the total inmate population of JCI was 1,157.  *Id.* at 4.  The total population of Jefferson County including the prison was 14,761.  *Id.* at 11.  Excluding the prison, the total population of Jefferson County dropped down to 13,604.  *Id.* at 12.  The 1,157 inmates comprise 37.69% of the population base in District 3 that Defendants used in preparing the 2013 redistricting plan.  *Id.*

The 2013 Plan, which included the JCI incarcerated population, had an overall deviation of 8.67%.  *Id.* at 11-12.  However, once the inmates are removed from the population count, the Plan's deviation rises to 42.63%.  *Id.* at 12-13.

The overwhelming majority of JCI prison inmates are not residents of Jefferson County, much less District 3.  *Id.* at 6, 12-13.  Once they are convicted and sentenced to incarceration, JCI inmates do not have a choice as to whether to serve their sentence at JCI.  Fla. Stat. § 944.17(2) ("Each prisoner committed to the custody of the department [of corrections] shall be conveyed to such institution, facility, or program in the correctional system as the department shall direct, in accordance with its classification scheme.").  In addition, the children of persons incarcerated at JCI are not allowed to attend public schools in Jefferson County by claiming JCI as their parent's residence.[4]

Following the 2010 Census, the County Commission hired the firm Bryant, Miller, and Olive, P.A., in association with Kurt Spitzer and Associates, P.A., who prepared two proposed redistricting plans – Plan A and Plan B.  Exs. 2 and 3.  Both proposed plans included the prison inmates at JCI in the total population count.  *Id.*  In

---

[4] *See* Jefferson County School Board's Response to Request No. 4 in Plaintiffs' First Request for Admissions at ¶ 1, attached as Exhibits 7 and 8, respectively.

November 2013, the School Board held a public hearing during which it considered Plan A and Plan B for its own redistricting purposes. Jefferson County School Board's Answer to Complaint (DE 16) at ¶ 29. The School Board hired an independent consultant to review Plan A and Plan B and to draft alternative plans. *Id.* at ¶ 30.

Some of the alternative plans the independent consultant for the School Board prepared showed that it was possible to satisfy traditional redistricting principles, including the one person, one vote standard, without including the inmates at JCI in the total population count. Ex. 4. In fact, at least seven Florida counties have redistricted without including the prison population in their population count. *See* Expert Report of Peter Wagner (Wagner Expert Report) at 5-6, attached as Ex. 5.[5]

Plaintiff Kate Calvin attended the December 3, 2013 public hearing and testified in opposition to Plan A and Plan B. Plaintiffs' Complaint (DE 1), at ¶ 32. As part of her testimony, she presented slides which pointed out the severe population discrepancies that including the incarcerated population at JCI in District 3 would cause. *Id.* Calvin also argued that Plan A unfairly diluted minority voting strength and created an unfair voting advantage for white voters. *Id.* In fact, the black voting age population decreases from 47.62% to 32.60% when the prison population is excluded, and the Hispanic voting age population decreases from 7.35% to 2.80%. Ex. 6.

Plaintiff John Nelson served on the County Commission, representing District 2, during the County's redistricting process, including through the vote on the final

---

[5] Those counties are: Bradford, Franklin, Gulf, Lafayette, Madison, Okeechobee, and Washington. The Bradford County School District and the Okeechobee County School District are known to have excluded the prison population in their final redistricting plan as well. Ex. 5 at 6.

redistricting plan.  DE 1 at ¶ 33.  Nelson opposed both Plan A and Plan B and argued the plans unnecessarily diluted minority voting strength.  *Id.*

On December 3, 2013, the County Commission voted 3-2 to approve Plan A (the "2013 Redistricting Plan"), even though the plan relied on the inmates at JCI to make up 37.69% of the total population in District 3, and 43.2% of the voting age population in the district.  Jefferson County Board of Commissioners' Answer to Complaint (DE 21) at ¶ 34.  Plaintiff Nelson voted against the 2013 Plan.  *Id.* at 35.  In December 2013, the School Board adopted Plan A as its redistricting plan as well.  Jefferson County School Board Answer to Complaint (DE 16) at ¶ 36.

Plaintiffs filed their Complaint alleging a "one person, one vote," under the Equal Protection Clause on March 9, 2015.  DE 1.  Defendants filed their Joint Motion for Summary Judgment on July 29, 2015.  DE 24.

## STANDARD OF REVIEW

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.

The burden then shifts to the nonmoving party who "must set forth specific facts

6

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting former Fed. R. Civ. P. 56(e)).  It is not sufficient for the nonmoving party "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.  *Celotex Corp.*, 477 U.S. at 324.

Cross-motions for summary judgment do not change the summary judgment standard, but "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed."  *Proch v. DeRoche*, No. 3:08-cv-484, 2011 WL 6841319, at *6 (N.D. Fla. Dec. 20, 2011) (citing *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)).  As demonstrated below, there are no material facts in dispute, and Plaintiffs are entitled to judgment in their favor as a matter of law.

## ARGUMENT

The Supreme Court enunciated the principle of "one person, one vote," in *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964) ("We hold that . . . one man's vote in a congressional election is to be worth as much as another's.").  The Court extended its holding in *Wesberry* to state legislative bodies in *Reynolds v. Sims*, 377 U.S. 533 (1964). During the 1960's, the number of prisoners in state and federal penal institutions was nowhere near what it is today, and Florida ranks among the top ten states with the highest

incarceration rate.[6]  One of the many collateral consequences of this prison industrial complex is the electoral consequence of housing inmates outside of their county of residence and the impact on residents who live close to where these prisons are located. "Prison-based gerrymandering" is a practice whereby local governments include inmates as residents of the district where the prison is located when drawing election lines. Defendants' actions challenged in this lawsuit perfectly fit that definition.

Plaintiffs do not argue that the counting of prisoners for redistricting purposes is *per se* impermissible.  However, when, as in this case, the non-resident prison population constitutes close to half of the districted population, the Constitution does require Defendants to present a "legally acceptable justification" for their actions.  *Kirkpatrick v. Preisler*, 394 U.S. 526, 532 (1969).  Defendants have not asserted such a justification, and simply saying, "the law made me do it," does not satisfy their burden.  If Defendants' position were to prevail, then there would be no limit on the percentage of inmates that could permissibly be included in the redistricting count.  Certainly, this is not what the Supreme Court intended in its seminal cases establishing the one person, one vote principle.  *See Reynolds v. Sims*, 377 U.S. at 567 ("[T]he basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives."); *Wesberry v. Sanders*, 376 U.S. at 8 ("To say that a vote is worth more in one district than in another would not only run counter to our fundamental ideas of democratic government, it would cast aside the principle of a [legislative body] elected 'by the People.'").  Further, despite Defendants' efforts to suggest otherwise, *see*  DE 24 at 6, the Supreme Court has never held that racial

---

[6] *See* E. Ann Carson, Ph.D., *Prisoners in 2014*, Bureau of Justice Statistics, September 2015, available at *http://www.bjs.gov/content/pub/pdf/p14.pdf*.

discrimination is an essential element of a one person, one vote claim. *See* Reynolds *v. Sims*, 377 U.S. at 566 ("Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon facts such as race . . . or economic status . . . .") (internal citations omitted).

> A.   **The JCI inmate population can be meaningfully distinguished from true Jefferson County residents for purposes of Plaintiffs' one person, one vote claim.**

In arguing that "total population," including the prison, was the proper basis upon which to redistrict, Defendants lump the incarcerated and isolated JCI inmate population together with actual Jefferson County residents such as students, children, and non-citizens, as an undifferentiated group of "nonvoting members," as if there were no meaningful distinctions between them. DE at 12-13. In support of their position, Defendants rely on cases that, in fact, further buttress Plaintiffs' arguments as to why residency is a key determinant in who should be counted for redistricting purposes.

In *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (Jan. 7, 1991) (No. 90-849), the district court found the County of Los Angeles had enacted a discriminatory redistricting plan that diluted the voting strength of Hispanic voters. 918 F.2d at 767. On appeal, one of the arguments the County raised was that only the voting population, not the total population, should have been counted for redistricting purposes especially given the number of noncitizen Hispanics concentrated in one district of the County. *Id.* at 773. The Ninth Circuit rejected that argument, reasoning that "[b]asing districts on voters rather than total population results in serious population inequalities across districts," and that "citizens of voting age, minors, and

9

others residing in the district will suffer diminishing access to government in a voter-based apportionment scheme." *Id.* at 774-775.  The court recognized that noncitizens play an integral role in society "short of voting or holding a sensitive public office." *Id.* at 775.  By contrast, JCI inmates effectively have no access to local government that can be diminished.

The plaintiffs in *Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000), *cert. denied*, 121 S.Ct. 2020 (May 21, 2001) (No. 99-1946), another case on which Defendants rely, argued that the City, despite being aware that it contained pockets with extremely high ratios of noncitizens, improperly drew its district lines based on total population rather than on the citizen voting age population (CVAP).  206 F.3d at 522.  Similar to the court in *Garza*, the Fifth Circuit in *Chen* found that noncitizen residents play an important role in their communities which supports their inclusion in the population count even though they cannot actually vote.  The court was especially concerned about an imbalance in population size in instances where a representative has a significantly larger district population-wise, but less ability to meet the needs of all of those residents if voting eligibility were to be required.  *Id.* at 525.  This was a clear recognition that all actual residents are impacted by government decisions and, therefore, should be able to petition their representatives about issues that affect their lives with the same level of influence as eligible voters.  *See also Lepak v. City of Irving, Texas*, 453 Fed. Appx. 522, 523 (5th Cir. 2011) (per curiam) (summarily rejecting plaintiffs' argument to only count

citizens when redistricting given its decision in *Chen v. City of Houston*), *cert. denied*, 133 S.Ct. 1725 (Apr. 1, 2012) (No. 12-777). [7]

In *Evans v. Cornmann*, the Supreme Court rejected efforts to exclude non-voting residents living on a federal reservation or enclave, owned by the National Institutes of Health (NIH) and located within the geographical boundaries of Montgomery County, MD. 398 U.S. 419 (1970). The Court recognized that residents on NIH property, although unable to vote, were "just as interested in and connected with electoral decisions . . . as their neighbors who live off the enclave." *Id.* at 426. Examples of their concerns, the Court noted, included "state spending and taxing decisions"; state unemployment laws, workmen's compensation, and vehicle registration requirements that applied equally to them; and the Maryland public schools to which they sent their children. *Id.* at 1756. Thus, the Court concluded that, "[i]n nearly every election . . .appellees have a stake equal to that of other Maryland residents." *Id.* at 1757. *See also Davidson v. City of Cranston*, 42 F.Supp.3d 325, 331 (D. RI 2014) ("The Supreme Court has consistently recognized the rights of noncitizens, minors and other similar groups to express themselves politically and otherwise participate in civic life.").

Inmates at JCI, on the other hand, do not partake in daily life, or enjoy any of the amenities the county has to offer in the same way that other residents - even non-voting residents - are able to. Thus, unlike other populations that may not vote, the JCI population is cut off from the rest of Jefferson County's District 3 and cannot be

---

[7] The Supreme Court will address the question of whether representational or electoral equality is constitutionally mandated this coming term in the case *Evenwel v. Abbott*, 135 S.Ct. 2349 (May 26, 2015) (No. 14-940). The outcome of that case, however, will not affect the question presented here since counting the persons incarcerated at the JCI as part of Jefferson County's population base does not serve the goals of either representational or electoral equality.

considered genuine members of the community. Students and non-citizen residents provide a particularly useful contrast since they may move through the community freely, shop at local businesses, and interact with other residents. Any suggestion by Defendants that JCI prisoners enjoy the same level of freedom would be ludicrous.

Plaintiffs do not seek a blanket rule that inmates should never be counted. However, Jefferson County presents an extreme case of a non-resident population being counted to such an extent that the overall deviation, if they were excluded, exceeds 40%. Plaintiffs maintain that, in light of this high deviation, Defendants should not have included the incarcerated persons at JCI and were not constitutionally required to do so for the reasons set forth more fully below.[8] Thus, this Court should reject Defendants' attempt to conflate the isolated population of JCI with the actual resident population in Jefferson County.

### B. The 2013 Redistricting Plan fails to meet population equality standards.

Defendants' only legal argument is that the 2013 Redistricting has an overall deviation of less than 10% and, therefore, Plaintiffs have failed to make out a prima facie case for a one person, one vote claim. DE 24 at 8-13. By making this assertion, Defendants are promoting a policy by which they may count inmates, regardless of their numerical size, as part of Jefferson County's population base for redistricting purposes. This theory also ignores the little resemblance this population bears to actual Jefferson

---

[8] *See* Wagner Expert Report (Ex.5) at 9, listing 98 places, including counties in Florida, that have chosen to avoid prison gerrymandering even though the potential impact is smaller than in the case of Jefferson County.

County constituents. If the JCI population were not erroneously included, the 2013 Plan actually has an overall deviation of 42.63%. *See* Cooper Expert Report at 12-13.

Defendants rely heavily upon two 2001 Attorney General Opinions which improperly concluded that Gulf County's school board and county commission had to include prisoners in its population count for redistricting purposes. *See* Op. Att'y Gen. Fla. 01-55 (2001), Op. Att'y Gen. Fla. 01-56 (2001); Defs' Br. at 12. As an initial matter, the Attorney General's conclusion was legally flawed for the reasons set forth in this brief, namely that the Supreme Court and other legal precedent clearly establish that the County was not required to include the prison population. This flexibility is best illustrated by the fact that Gulf County, which solicited the Attorney General's opinion, opted not to follow it. Wagner Expert Report at 6, fn. 9. Gulf County is one of seven counties in Florida that chose not to include its prison population during redistricting and, to Plaintiffs' knowledge, has not suffered any legal or other ramification for doing so. Thus, Defendants' argument that they had to include the inmates at JCI is simply untrue.

Further, in *Mahan v. Howell*, the Supreme Court held that in some circumstances jurisdictions must adjust raw census data in order to meet the constitutional requirement of making a "good-faith effort to achieve absolute equality." 410 U.S. 315, 325 (1973). The Supreme Court expressly recognized there may be instances when reliance on census figures is not only misplaced, but unconstitutional for achieving population equality. *Id.* at 322-323. The Court's holding and reasoning in *Mahan* has been applied in the prison gerrymandering context as well. *Davidson v. City of Cranston* involved a challenge to the City's redistricting plan which included the entire population of the state's only prison into a single ward. 42 F.Supp.3d 325. In denying the City's motion to dismiss,

the court acknowledged that the City could legally exercise some discretion in drawing its district lines to exclude the prison. *Id.* at 328 (citing *Reynolds v. Sims*, 377 U.S. at 578). *See also id.* at 330 ("The Supreme Court has noted that the political disproportion that may be caused by counting non-voting residents, which tends to be more evenly distributed in large districts, is magnified in smaller districts."). In the instant case, the overwhelming majority of inmates at JCI are not residents of the county, and all of JCI's population is concentrated in District 3. The result is that non-Jefferson County residents represent over 40% of the voting age population, and the overall redistricting plan has a 42.63% deviation.

Defendants' assertion that they must rely on census figures when creating voting districts is false. Defendants cannot blindly rely upon census numbers when such reliance has led to a deviation that so extremely exceeds the presumptively constitutional 10%. This is perhaps even more compelling given that Defendants were presented with plans that did not include the prison population and satisfied traditional redistricting principles, but chose not to adopt them. Ex.s B-1, B-2, and B-3 to Cooper Expert Report. In addition, due to extensive interest from its end users, the Census Bureau began to provide an "Advanced Group Quarters" file as of the 2010 Census to give jurisdictions and districting professionals the data they need to make the relevant adjustments. Wagner Expert Report at 3-5. Defendants hired redistricting experts as consultants who could have easily adjusted their base population data so as to avoid the severe distortions caused by the non-resident ACI population. *Id.*; DE 24 at 5.

Defendants argue that *Burns v. Richardson*, 384 U.S. 73 (1966), suggested that courts should accord a significant measure of respect to legislative choices related to

14

districting. DE 24 at 8, fn. 1. However, Defendants ignore a critical caveat. The Supreme Court noted in *Burns* that such deference is due "*[u]nless a choice is one the Constitution forbids.*" *Burns*, 384 U.S. at 92 (emphasis added). "Neither in *Reynolds v. Sims* nor in any other decision has this Court suggested that the States are required to include . . . persons denied the vote for conviction of a crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured." *Id.* Thus, the County's decision to count the entire population of individuals involuntarily incarcerated at JCI in a single district, resulting in a population deviation of 42.63% in county commission and school board elections, is a choice the Constitution does in fact prohibit. *See Abate v. Mundt*, 403 U.S. 182, 185-186 (1971) ("[W]e have underscored the danger of apportionment structures that contain a built-in bias tending to favor particular geographic areas or political interests or which necessarily will tend to favor, for example, less populous districts over their more highly populated neighbors.").

### C. Defendants have not asserted any legally acceptable justification for including the non-resident incarcerated population at JCI.

Because the inclusion of the JCI prison population results in a 42.63% overall deviation in the 2013 Redistricting Plan, and given that Defendants had several available options in developing a plan that would exclude the prison, the 2013 Redistricting Plan does not meet population equality standards. In order to sustain the plan, Defendants needed to present a "legally acceptable justification for the population variances." *Kirkpatrick*, 394 U.S. at 532. *See also Brown v. Thomson*, 462 U.S. 835, 842-843 (1983) (a plan with a deviation larger than 10% "creates a prima facie case of discrimination and therefore must be justified "). Other than misinterpreting and misapplying legal

15

precedent to explain why they included the prison, Defendants have not even attempted to offer any legally acceptable justifications for why including the prison was absolutely necessary or the best way to address any concerns Defendants allegedly had.

In *Reynolds v. Sims*, the Court stated:

> [I]f a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted.... The resulting discrimination against those individual votes living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. Two, five, or 10 of them must vote before the effect of their voting is equivalent to that of their favored neighbor.

377 U.S. at 562. Moreover, the court concluded:

> [I]t is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable."

*Id.* In this case, actual residents of District 3, once the JCI population is excluded, wield much more political power than residents in the other four districts. *See* Cooper Expert Report at 12-13.

Even had Defendants tried to proffer legitimate considerations for counting the JCI inmate population, other courts have already rejected the most likely explanations. In *Davidson v. City of Cranston*, the court rejected the City's two main arguments in support of its decision to include the prison population in its redistricting plan. 42 F.Supp.3d at 331-332. The court found that including the prisoners did not promote electoral equality because the inmates could not vote, and did not advance representational equality because, "[n]onvoting residents generally have a right to petition election officials, even

16

if they were not able to vote for them; and they may generally be presumed to have a great interest in the management of their municipalities. This is true of minors, noncitizens, college students, and military and naval personnel." *Id.* at 331. Here, Defendants have not proffered even one legally acceptable justification to excuse their decision to include the inmates at JCI, and the law clearly does not support their argument that they had no choice but to do so. Absent such a justification, Defendants should not be allowed to conduct any elections under their current unconstitutional plan.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion for Summary Judgment, grant Plaintiffs' Cross-Motion for Summary Judgment, and enter a declaratory judgment for Plaintiffs on their equal protection claim.

Respectfully submitted,

*/s/Nancy G. Abudu*
Nancy Abudu (Fla. Bar No. 111881)
nabudu@aclufl.org
Shalini Goel Agarwal (Fla. Bar No. 90843)
sagarwal@aclufl.org
ACLU Foundation of Florida, Inc.
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
Tel: 786-363-2700
Fax: 786-363-1448

Randall C. Berg, Jr. (Fla. Bar No. 318371)
rberg@FloridaJusticeInstitute.org
Dante P. Trevisani (Fla. Bar No. 72912)
dtrevisani@FloridaJusticeInstitute.org
Florida Justice Institute, Inc.
100 SE Second St., Ste. 3750
Miami, FL 33131-2115
Tel: 305-358-2081
Fax: 305-358-0910

*Attorneys for the Plaintiffs*

**Certificate of Service**

I hereby certify that on September 18, 2015, I sent this document to counsel for the parties listed below in the manner prescribed.

/s/ *Nancy G. Abudu*
Nancy G. Abudu

**By CM/ECF:**

Gerald B. Curington
Ausley McMullen, P.A.
P.O. Box 391 (32302)
123 S. Calhoun Street
Tallahassee, FL 32301
Email: jcurington@ausley.com
mmckenzie@ausley.com

*Attorneys for Defendant Jefferson County School Board*

Zackery A. Scharlepp
Linda Bond Edwards
Rumberger, Kirk & CaldwelL
A Professional Association
215 South Monroe Street, Suite 702
Post Office Box 10507
Tallahassee, Florida 32302-2507
Telephone: (850) 222-6550
E-mail: ledwards@rumberger.com
dmarsey@rumberger.com
zscharlepp@rumberger.com

*Attorneys for Defendants Jefferson County Board*
*of County Commissioners and Marty Bishop,*
*Supervisor of Elections, in his official capacity*