IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

Tallahassee Division

KATE CALVIN, JOHN NELSON,
CHARLES J. PARRISH, LONNIE GRIFFIN
and CONCERNED UNITED PEOPLE,

        Plaintiffs,

vs.

JEFFERSON COUNTY BOARD OF
COMMISSIONERS, JEFFERSON COUNTY
SCHOOL BOARD, and MARTY BISHOP,
SUPERVISOR OF ELECTIONS, in his official
capacity,

        Defendants.

_____/

Case No.: 4:15-cv-00131-MW-CAS

**SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT, AND IN OPPOSITION
TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

       Plaintiffs, by and through counsel, file this supplemental brief in further support of their Cross-Motion for Summary Judgment, in Opposition to Defendants' Motion for Summary Judgment, and in accordance with the Order (DE 43) directing the parties to provide Supplemental Facts and to Brief the issue of "representational nexus," and accordingly state as follows:

## STATEMENT OF ADDITIONAL MATERIAL FACTS[1]

1. JCI is a largely self-contained, state run and operated correctional facility under the sole direction and control of the Florida Department of Corrections (FDC). Hodgson Dep. 44:9 – 47:7 (Ex. 9).

2. JCI pays Jefferson County for its trash and garbage collection which is then dumped into the County landfill. Hodgson Dep. 46:11 – 46:21.

3. JCI has its own inmate regular and law library, and the Jefferson County School Board and the School system do not provide any educational services to the inmates at JCI. Hodgson Dep. 60:10 – 11, 79:11 - 16.

4. Medical services for JCI inmates are provided by Corizon, LLC, which is under contract with the Florida Dept. of Corrections. Hodgson Dep. 71:10 – 71:13.

5. The County bills JCI for any emergency services it provides JCI. Hodgson Dep. 71:8 – 71:13.

6. Persons incarcerated at JCI are not permitted to or able to make direct calls to the Jefferson County Sheriff or Jefferson County Fire Department to request assistance. Hodgson Dep. 46:-25 – 47:7.

7. The Florida Department of Corrections has its own institutional inspector at JCI as well as Inspector General personnel to investigate any criminal activities at JCI or inmate complaints. Hodgson Dep. 81:14 – 82:20.

8. The FDC has an internal administrative process that inmates generally first follow when complaining about their conditions of confinement. Hodgson Dep. 81:14 – 82:3. If there

---

[1] The parties also filed this date a Joint Stipulation of Facts (DE 45). These "Additional Material Facts" are supplemental to the Joint Stipulation of Facts, as well as those exhibits previously filed in support of Plaintiffs' Cross-Motion for Summary Judgment (DE 30).

is an incident at the prison that requires an investigation by law enforcement, the Inspector General's office initiates the investigation process with possible involvement by the State Attorney's office. Hodgson Dep. 82:12 – 82:20.

9. Persons incarcerated at JCI may be furloughed for a specific approved reason such as a funeral or an elective medical procedure. Hodgson Dep. 24:8 – 24:21. If an inmate is accompanied by local law enforcement officers to attend a funeral or other family-related event, the inmate or the inmate's family is solely responsible for the monetary costs associated with being accompanied by local law enforcement, i.e. the officer's time and any other related expenses. Hodgson Dep. 25:18 – 27:8.

10. Even when JCI inmates are on furlough and accompanied by local law enforcement officers, the inmate remains a state prisoner under the custody and control of the Department of Corrections. Hodgson Dep. 30:13 – 30:23.

11. JCI inmates are assigned to work details in the City of Monticello or the County, off of JCI grounds, at any given time and are instructed by their supervisors not to speak with or approach anyone in the general public while performing their tasks. Hodgson Dep. 40:18 – 42:15.

12. As part of the work detail, inmates work on projects ranging from the County's recycling program, sidewalk repairs, mowing the grass, cleaning restrooms, moving furniture within city buildings, and maintaining school grounds. Hodgson Dep. 62:1 – 62:10.

13. Jefferson County does not pay inmates for the work they do in the County as part of JCI's work detail program. Boyd Dep. 47:12 – 48:24, (Ex. 10).

14. If JCI inmates did not perform work around the County, the County would have to pay someone to complete the same tasks. Boyd Dep. 48:11 – 48:24.

15. JCI inmates earn gain time by working inside or outside of the prison. Hodgson Dep. 56:19 – 56:22.

16. JCI inmates are not allowed to visit or patronize public or private establishments in Jefferson County such as restaurants, hotels, grocery stores, gas stations, schools, movie theaters, museums, musical performances, shops, parks, playgrounds, athletic fields, theatres, churches, businesses, recreational centers, or public transportation. Hodgson Dep. 40:18 – 42:15; Defs' Resp. to Pls' 1st Requests for Admission (Exs. 7 and 18).

17. About 15-20% of JCI inmates are permitted to participate in JCI's work detail program, and only those who are in the lowest classification level (community or minimum security) are allowed in the program. Hodgson Dep. 78:24 – 79:8.

18. Jefferson County has never used the inmate population and property at JCI as part of a claim for reimbursement through the payment in lieu of taxes for its inability to tax the state property where JCI is located. Boyd Aff. ¶ 32.

19. In the two years since JCI's Warden Chris Hodgson has been at JCI, he is unaware of any county commissioner or school board member visiting the prison in his or her official capacity. Hodgson Dep. 18:16 – 19:4.

20. Although the Census Bureau counted prisoners in the census block where JCI is located, in 2015 only approximately 9 inmates last resided in Jefferson County before their incarceration. (Ex. 1, at 6, 12-13).

21. On several occasions during County Commission meetings, Jefferson County Commissioner Betsy Barfield moved the Commission to exclude JCI from its redistricting plan. Def. Jefferson County Board of Commissioners' Resp. to Pls.' 1st Request for Produc. (Bates #

000038, 000061 - 000065, 000073 – 000077, 000078 – 000081, 000104 – 000106, 000118 – 000123, 000129 – 000131, 000133 – 000137, 000151 – 000156) (Ex. 11).

22. Members of the public, including Plaintiff Charles Parrish, commented during County Commission meetings that including the JCI inmates in the redistricting plan would pose a problem and result in skewed population figures between the districts. Def. Jefferson County Board of Commissioners' Resp. to Pls.' 1st Request for Produc. (Bates # 000012- – 000017, 000061 - 000064) (Exs. 11 and 12).

23. Plaintiff Kate Calvin also commented during the County Commission meeting and made a slide presentation showing what the deviation and population numbers would be if the prison were excluded from the redistricting plan. Def. Jefferson County Board of Commissioners' Resp. to Pls.' 1st Request for Produc. (Bates # 000146- – 000147) (Ex. 13); Pls' Resp. to Defs' 1st Request for Produc. (Bates # 0038-0039) (Ex. 14).

24. Hines Boyd is the Jefferson County Commissioner for District 3 where JCI is located. Boyd Dep. 8:20 – 9:9.

25. Mr. Boyd stated during a County Commission meeting that including prisoners in a redistricting plan actually helps rural communities, and that more effort should be made to have the prison work crews provide more free labor in the County. Def. Jefferson County Board of Commissioners' Resp. to Pls.' 1st Request for Produc. (Bates # 000134 – 000137) (Ex. 16).

26. Mr. Boyd has never visited a JCI inmate in his official capacity as a commissioner. Boyd's only physical interaction with JCI inmates is when he sees them working around the County as part of a work crew. Boyd Dep. 16:8 – 16:16.

27. Mr. Boyd testified during his deposition that, with respect to the one inmate complaint he remembered receiving: "There was nothing that I could help any of those prisoners

with what they asked for.  So I just opened the [inmate's] letter, and I read it and set it aside." Boyd Dep. 21:5 – 21:25.  He further testified that he never responded to that letter.  Boyd Dep. 21:24 – 21:25.

28.     Shirley Washington is the Jefferson County School Board member for District 3 where JCI is located.  Washington Dep. 8:7 – 8:9 (Ex. 17).  She voted against the adopted redistricting plan.  Washington Dep. 26:13 – 26:17.

29.     Ms. Washington has only received two letters and a holiday card from an inmate at JCI who she testified was a resident of Jefferson County before his incarceration.  Washington Dep. 31:3 – 31:24.

30.     When asked whether she ever did anything to address prison conditions or other concerns of JCI inmates, Washington responded: "There was nothing I can do there about that, because they have administrators and other folks to take care of that.  That would have been certainly out of my lane."  Washington Dep. 32:3 – 33:5.  She further testified that, with respect to the inmates' prison living conditions, "I couldn't do anything about that."  Washington Dep. 33:6 – 33:13.

31.     Washington testified she has never circulated any campaign materials in the prison because the inmates cannot vote.  Washington Dep. 34:13 – 34:19.

32.     None of the policies that Ms. Washington proposed or supported in her capacity as a School Board member addressed the needs of JCI inmates.  Washington Dep. 30:4 – 34:10.

33.     Washington would not oppose a redistricting plan that excludes the prison population.  Washington Dep.30:18 – 31:2.

34.     There was no effort made on the part of the Jefferson County Commission or School Board to ensure participation from or solicit comments from any inmates at JCI regarding the County's redistricting process.  Hodgson Dep. 47:13 – 48:2.

## ARGUMENT

Defendants have argued that it was proper to include the inmate population at JCI in the adopted redistricting plan and to concentrate those inmates in District 3 because there is a "representational nexus" between local representatives in the county and JCI inmates.  Defs' Resp. to Pls' Cross-Motion for Summary Judgment at 7-8.[2]  In support of this contention, Defendants identify two primary ways they view JCI inmates as having "a fundamental interest in the management and politics of Jefferson [C]ounty": (1) JCI inmates have access to county commissioners and school board members and are able to seek redress from them for their grievances; and (2) the County's decisions, especially with respect to its budget and the quality

---

[2] As Plaintiffs stated during the January 6, 2016 hearing before this Court, Defendants raised the argument of a "representational nexus" for the first time in response to Plaintiffs' cross motion for summary judgment. Federal Rule of Civil Procedure 8(c) requires that a responsive pleading set forth certain enumerated affirmative defenses as well as any other matter constituting an avoidance or affirmative defense. Fed.R.Civ.P. 8(c).  The Eleventh Circuit has defined an affirmative defense as, "[a]ny matter that does not tend to controvert the opposing party's *prima facie* case as determined by the applicable case law." *Hassan v. United States Postal Serv.,* 842 F.2d 260, 263 (11th Cir.1988).  "Failure to plead an affirmative defense generally results in a waiver of that defense." *Latimer v. Roaring Toyz, Inc*., 601 F.3d 1224, 1239 (11th Cir. 2010). *See also Steger v. General Elec. Co*., 318 F.3d 1066, 1077 (11th Cir. 2003) ("The pleading of an affirmative defense is mandated by Federal Rule Civil Procedure 8(c) to be presented in a responsive pleading, and a party waives its right to advance an affirmative defense by failing to assert it in such.").  Although the court reopened discovery, Plaintiffs were still disadvantaged in having to incur further costs to depose witnesses in a truncated time period - witnesses who could have been deposed during the several months prior to Defendants filing their own motion for summary judgment.  These expenses and delay could have been avoided if Defendants had timely raised this affirmative defense.  Therefore, Defendants should be deemed to have waived this argument. *See Keybank National Association v. Hamrick*, 576 Fed. App'x. 884, 888 (11th Cir.2014) (ruling that defendant waived an affirmative defense by not raising it in any of the defendant's three answers, and was only raised pursuant to a summary judgment motion).

of its public schools, directly and significantly impact JCI inmates. *Id.* at 7. However, the record clearly undercuts both of those theories. Jefferson County Commissioners and its School Board members, and even more specifically the representatives of District 3, do not treat JCI inmates as "true constituents" of the County. Neither Washington nor Boyd has ever visited JCI or individual inmates in their official capacities as elected officials, let alone done any campaigning or held public meetings at JCI. Inmates are unable to call or meet with elected officials, and they cannot attend any of the public meetings Defendants hold. Moreover, JCI's operation and budget is wholly separate from the County and, if anything, it is the prison that contributes to the County's general budget rather than the other way around through the free prison labor the County receives. Other than fire services that JCI pays the County for (which JCI has not used in at least two years), and emergency medical services (for which the County may seek reimbursement), JCI inmates can hardly be said to be "directly and significantly" impacted by the County's budget and operation.

      **A.**     **JCI inmates are not true constituents in Jefferson County.**

"Representational equality" is based on the notion that each elected official should represent approximately the same number of people. Taren Stinebrickner-Kauffman, *Counting Matters: Prison Inmates, Population Bases, and "One Person, One Vote"*, 11 Va. J. Soc. Pol'y & L. 229, 233 (2004). In the case of a county like Jefferson with a prison population that makes up 43.2% of the voting age population in a single district, the question of equal representation turns on the nature of the representation the inmates receive from local elected officials. This also means that Defendants, who accounted for JCI's prison population in their redistricting plan, must demonstrate allocation of county resources to the inmates in the same manner as other constituents. This the County has failed to do.

1.  **The overwhelming number of JCI inmates are not residents of Jefferson County.**

Although the Census Bureau did count in 2015 all prisoners in the census population block where JCI is located, only approximately 9 out of 1157 inmates last resided in Jefferson County before their incarceration. Ex. 1 at 6, 12-13. Thus, the majority of persons presently incarcerated at JCI are not Jefferson County residents. *See also Mitchell v. United States*, 88 U.S. 350, 353 (1874) ("Mere absence from a fixed home, however long continued, cannot work the change. There must be the *animus* to change the prior domicile for another. Until the new one is acquired, the old one remains.").

Florida's Constitution states that county commission districts shall be fixed "so as to keep them as nearly equal in proportion to population as possible". Art. 8, Sec. 1(e); Fla. Stat. §124.01. Defendants repeatedly have asserted that Florida law required them to include the prison in the population count and that they were constrained to using the figures the Census Bureau provided following the 2010 decennial census. However, as elaborated upon in Plaintiffs' opening brief [DE 30], the Supreme Court has upheld deviations from total population based on various political considerations, including whether certain populations are true residents of a jurisdiction. *Burns v. Richardson*, 384 U.S. 73 (1966); *Evans v. Cornmann*, 398 U.S. 419 (1970); *Mahan v. Howell*, 410 U.S. 315, 325 (1973). In contrast to all of the reasons why the people living at the NIH enclave in *Evans* were true residents of the community (and hence entitled to the franchise there), those present at JCI are not. *See also* Kenneth Prewitt, Foreword to Patricia Allard & Kirsten D. Levingston, Brennan Ctr. For Justice, *Accuracy Counts: Incarcerated People and the Census* (2004) ("Incarcerated people have virtually no contact with

the community surrounding the prison. Upon release the vast majority return to the community in which they lived prior to incarceration.”).[3]

Thus, the Census Bureau’s population count is not the sole and purely accurate source for determining how jurisdictions, especially local jurisdictions with discrete and unique political considerations, should draw their districts with respect to population size. *Gaffney v. Cummings*, 412 U.S. 735, 746-47 (1973). Therefore, Defendants cannot hide behind the Census Bureau, the Florida Constitution, an Attorney General’s Opinion, or any other law as a justification for their unconstitutional redistricting plan. As a result, the actual population deviation among true residents is 42.63%, not 8.67%. Defendants cannot rely conclusively on Census figures when such reliance leads to such a serious and significant departure from the “one person, one vote” standard.

### 2. JCI does not benefit in any significant way from Jefferson County services.

JCI inmates do not benefit at all from being incarcerated in Jefferson County. The prison is a self-contained, state run and operated correctional facility under the direction of the Florida Department of Corrections. Hodgson Dep. 44:9 – 47:7 (Ex. 9) . JCI has its own water system and storage tank, its own sewage treatment services, and receives electricity from a commercial company not owned by Jefferson County. Joint Stipulation, ¶¶ 4, 5, 6 (DE 45). Moreover, FDC is under contract with Corizon, LLC which provides medical services to JCI. If an inmate needs hospitalization greater than what the prison infirmary can provide, the inmate is transferred to a hospital outside of Jefferson County. Hodgson Dep. 71:10 – 71:13. JCI does contract with Jefferson County for its trash and garbage collection, and fire and EMT services, but the County can seek reimbursement for any such services. Hodgson Dep. 46:11 – 46:21; Hodgson Dep. 71:8

[3] Available at http://www.prisonpolicy.org/scans/RV4_AccuracyCounts.pdf.

– 71:13. Therefore, the County does not lose money in servicing the prison, and in fact *makes money* off of the prison.

Another economic advantage the prison presents for the County is a free inmate labor pool. JCI's work detail program allows city and County facilities and departments to request inmates work on projects such as the County's recycling program, sidewalk repairs, mowing the grass, cleaning restrooms, moving furniture within city buildings, and maintaining school grounds. Hodgson Dep. 62:1 – 62:10. JCI inmates and their supervisors are strictly warned not to allow the inmates to approach, speak with, or otherwise interact with anyone from the general public while working outside around the County. Hodgson Dep. 40:18 – 42:15. As Commissioner Boyd testified, if the inmates did not perform this work, the County would have to pay someone else to do it whereas, with the inmates, they get the same work done for free. Boyd Dep. 48:11 – 48:24. Thus, there is no factual basis for Defendants' argument that the inmates "benefit" from receiving the county's public services. Moreover, Defendants' argument that JCI inmates benefit by working in the County because they earn gain time is irrelevant --- inmates will earn gain time regardless of where they work, in the County or at JCI. *See* Rule 33-603.401, F.A.C; Hodgson Dep. 56:19 – 56:22. It is the County and School Board which benefit from free prison labor, not the inmates.

### 3. Elected officials in Jefferson County, especially the representatives in District 3, do not consider JCI inmates to be their constituents, do not represent their interests, and have done nothing to address the inmates' specific needs.

Prisoners at JCI do not have any—let alone meaningful—access to or influence over the elected officials in District 3, their putative "representatives," or to other elected officials in the County. They cannot meet with local representatives individually or attend Commission or School Board meetings. Both Shirley Washington and Hines Boyd testified during their

depositions that, even as elected officials in District 3, they have not and do not view themselves as having the ability to improve the lives of JCI inmates or to address any complaints the inmates might make. Boyd stated that, with respect to the one inmate complaint he could remember: "There was nothing that I could help any of those prisoners with what they asked for. So I just opened the [inmate's] letter, and I read it and set it aside." Boyd Dep. 21:5 – 21:25. He further testified that he never responded to that letter. Boyd Dep. 21:24 – 21:25. When asked whether she ever did anything to address the prison conditions or other concerns of JCI inmates, Washington responded: "There was nothing I can do there about that, because they have administrators and other folks to take care of that. That would have been certainly out of my lane." Washington Dep. 32:3 – 33:5.

In the two years since JCI's Warden Chris Hodgson has been at the prison, he was unaware of any County Commissioner or School Board member visiting the prison in his or her official capacity. Hodgson Dep. 18:16 – 19:4. Defendants have never held any public meetings at JCI, nor can JCI inmates attend public meetings outside of the prison. Hodgson Dep. 47:13 – 48:2. When asked to produce correspondence between Defendants and JCI inmates, the School Board was only able to produce two letters and a holiday card from one inmate who Washington knew was a Jefferson County resident prior to his incarceration. Washington Dep. 31:3 – 31:24. And even then, Washington did nothing to change or improve the inmate's living conditions or concerns at the prison. Washington Dep. 33:6 – 33:13.

Therefore, unlike actual nonvoting constituents such as minors or non-citizens who live in, conduct business with, or come into frequent general contact with actual residents and constituents of Jefferson County, *cf. Garza*, 918 F.2d 763, 775 (9th Cir. 1990), JCI inmates are in no serious position to influence the votes of the local electorate or representatives. Due to their

confinement and utter lack of influence, inmates at JCI are not comparable to the actual residents of Jefferson County, and the record shows that elected officials have been wholly unresponsive to any complaints JCI inmates might have.  As a result, persons incarcerated at JCI are in no real sense members of the Jefferson County community.

Defendants could have easily excluded the prison population from their redistricting plan and were put on notice by a Commission member, demographer, and community members including some of the Plaintiffs, that doing so was legally possible and justifiable in light of the significant population distortion which resulted from including the prison in the adopted plan. Exs. 11, 12, 13, and 14.  By counting the JCI inmate population for purposes of redistricting and yet denying inmates any real and direct access to elected officials, Defendants are taking advantage of a vulnerable population for their own economic and political gain.

## CONCLUSION

For the reasons stated above and in Plaintiffs' opening brief, Plaintiffs' Cross-Motion for Summary Judgment should be granted, and Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/Nancy G. Abudu*
Nancy Abudu (Fla. Bar No. 111881)
nabudu@aclufl.org
Shalini Goel Agarwal (Fla. Bar No. 90843)
sagarwal@aclufl.org
ACLU Foundation of Florida, Inc.
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
Tel: 786-363-2700
Fax: 786-363-1448

*/s/Randall C. Berg, Jr.*
Randall C. Berg, Jr. (Fla. Bar No. 318371)

>rberg@FloridaJusticeInstitute.org
>Dante P. Trevisani (Fla. Bar No. 72912)
>dtrevisani@FloridaJusticeInstitute.org
>Florida Justice Institute, Inc.
>100 SE Second St., Ste. 3750
>Miami, FL 33131-2115
>Tel: 305-358-2081
>Fax: 305-358-0910
>
>*Attorneys for the Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2016, I electronically filed this document with the Clerk of Court using CM/ECF, which automatically serves all counsel of record via electronic transmission of Notices of Electronic Filing generated by CM/ECF.

                                                     */s/Randall C. Berg, Jr.*
                                                     Randall C. Berg, Jr.