# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

KATE CALVIN, JOHN NELSON,
CHARLES J. PARRISH,
LONNIE GRIFFIN, AND
CONCERNED UNITED PEOPLE,

       *Plaintiffs*,

v.                                      CASE NO. 4:15CV131-MW/CAS

JEFFERSON COUNTY BOARD OF
COMMISSIONERS, JEFFERSON
COUNTY SCHOOL BOARD, AND
MARTY BISHOP, SUPERVISOR OF
ELECTIONS OF JEFFERSON COUNTY,
IN HIS OFFICIAL CAPACITY,

       *Defendants.*
_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

Imagine a fictional Florida county—I'll call it Marshall County—with a total census population of 12,000. Marshall County is run by a board of commissioners comprised of five people, each of whom is elected from a single-member district with a total census population of exactly 2,400. The Marshall County School Board, which also has five members, uses the same district lines.

Marshall County is home to one of the state's largest state prisons—I'll call it Marshall Correctional Institution, or MCI—with an inmate population as of the last census of 2,200. The vast majority of inmates at MCI are not from Marshall County. MCI is run according to rules promulgated by the Florida Department of Corrections ("DOC") and laws passed by the Florida Legislature; the Board of County Commissioners and the School Board have no legal authority to directly regulate the conduct of inmates while they're inside the walls of MCI. Everything—from who is allowed to visit MCI, to where the inmates may smoke—is determined by legislators and administrators operating at the state level and officials at the prison who are employed by the state.

MCI is located entirely within District 3 of the County Commission/School Board districts. Thus, only 200 of the 2,400 people who are "residents" of District 3 are not incarcerated—just 8.5%. When elections are held every four years for the County Commission and School Board, only these 200 people (more precisely, the subset of these 200 people who are eligible to vote and who choose to vote) elect the County Commissioner for District 3 and the School Board member for District 3. In each of the other districts, none of which contains a prison, 2,400 people (more precisely, the

2

subset of these 2,400 people who are eligible to vote and who choose to vote) elect a County Commissioner and a School Board member.

Does Marshall County's districting scheme comport with the "one person, one vote" principle articulated by the Supreme Court? The short answer is "no." The scheme obviously weighs the votes of District 3 voters more heavily than those of voters in other districts. Less obviously, but just as importantly, the scheme gives the non-incarcerated population of District 3 (whether they vote or not) an increased ability to access and influence their representatives and increased opportunities to reap the benefits of that influence. "One person, one vote" is a theory of representative democracy that is subject to multiple reasonable interpretations, but Marshall County's scheme doesn't pass muster under any of them.

The real county at issue in this case, Jefferson County, differs from Marshall County only in degree. Its districting scheme is perhaps "less unconstitutional" than Marshall County's, but it still violates the Equal Protection Clause.

## A. Jefferson County

Jefferson County is a county in North Florida situated just east of Tallahassee. The total population of the county, according to 2010 census data, is 14,761. ECF No. 24, at 4 ¶ 8. The county is

3

governed by the Jefferson County Board of County Commissioners ("Board of Commissioners"), whose five members are each elected from a single-member district. *Id.* at 3 ¶¶ 2, 5. The county's school system is run by the Jefferson County School Board ("School Board"), which is also comprised of five members elected from five single-member "residence areas." *Id.* at 3 ¶ 4–5. Unlike the members of the Board of Commissioners, each of the members of the School Board "serve[s] as the representative of the entire [county], rather than as the representative of" the residence area or district from which he was elected.[1] § 1001.363, Fla. Stat. (2015).

Jefferson County is home to the Jefferson Correctional Institution ("JCI"), a state prison. The 2010 Census counted JCI as containing 1,157 inmates. ECF No. 30-8, at 10. As of May 18, 2015, only nine inmates at JCI were convicted in Jefferson County. ECF No. 30-1, at 52. The rest were convicted elsewhere in Florida and sent to JCI; a prisoner in the custody of the Florida Department of Corrections ("DOC") has no say in where he will serve his sentence. § 944.17(2), Fla. Stat. (2015); ECF No. 30-8, at 3.

---

[1] The Jefferson County School Board is the governing body of the Jefferson County School District. This means, unfortunately, that the term "district" has two different legal meanings vis-à-vis the School Board and the Board of Commissioners. To avoid confusion, I will use "district" throughout to refer to one of the five geographic areas that together cover all of the county.

## B. Redistricting

Under Florida law, the Board of Commissioners is required to redistrict following each United States Census. Fla. Const. art. VIII, § 1(e). The Board of Commissioners is supposed to divide the county "into districts of contiguous territory as nearly equal in population as practicable." *Id.* The School Board does not have to redistrict following the census, but has the statutory authority to redistrict if it deems it necessary to do so. § 1001.36, Fla. Stat. (2015).

Following the 2010 census, the Board of Commissioners consulted with a redistricting expert and concluded that it needed to redistrict in order to meet its obligations under the Florida Constitution. ECF No 25, at 4 ¶¶ 5–7. In 2013, the Board retained a number of attorneys and mapping/districting experts to help draw up proposals for a new districting scheme. *Id.* at 4 ¶¶ 7–8.

The School Board quite sensibly decided to re-draw its district lines to conform to those of the Board of Commissioners. ECF No. 48-9, at 35–36. The two bodies—"the Boards," collectively— met together on a number of occasions in mid-to-late 2013 to discuss the proposed redistricting plans. *See* ECF No. 30-1, at 32; ECF No. 30-4, at 3. At one point, the School Board retained a mapping/districting expert to design maps "to take to the table in talks

5

with the . . . Board of Commissioners." ECF No. 30-4, at 2. That expert prepared two maps for the School Board, ECF No. 30-1, at 29, one of which it presented to the Board of Commissioners at a November 4, 2013 joint workshop, ECF No. 30-4, at 3–4.

Throughout this process, the Boards received advice about how to deal with the large prison population in the county. The Board of Commissioners "was counseled that the [JCI] prison population must be included within the reapportionment base, and the population must be included within the district in which the prison was located." ECF No. 25, at 4 ¶ 8. The School Board was also advised that the prison population at JCI had to be included when determining whether districts contained roughly equal numbers of people. ECF No. 30-1, at 29.

This advice appears to have been based on opinions issued by the Attorney General of Florida to the Gulf County Board of County Commissioners and Gulf County School Board in 2001. ECF No. 24, at 4. Those opinions advised that, as a matter of state law, the Gulf County Boards were "required to include the prison population of the county" when determining whether districts contained substantially equal population numbers. 2001-55 Op. Att'y Gen. Fla. (2001) (Gulf County Board of County Commissioners);

2001-56 Op. Att'y Gen. Fla. (2001) (Gulf County School Board).[2]

The Attorney General arrived at his conclusions largely on the basis of the statutory definition of the term "population" (the definition is the same now as it was in 2001):

> Reference to the population or number of inhabitants of any county, city, town, village, or other political subdivision of the state shall be taken to be that as shown by the last preceding official decennial federal census, . . . which shall also be the state census and shall control in all population acts and constitutional apportionments, unless otherwise ordered by the Legislature.

§ 1.01(7), Fla. Stat. (2015).

The United States Census Bureau, which is the federal entity tasked with conducting the decennial census, counts prisoners as living in the census block(s) containing the correctional facilities in which they are incarcerated. *How We Count America*, U.S. Census Bureau, www.census.gov/2010census/about/how-we-count.php (last visited Mar. 16, 2016). The Census Bureau seems to recognize that this choice could potentially present problems, and that some state and local governments might want to adjust census data to

---

[2] Gulf County did not follow the Attorney General's advice—it excluded its large prison population when redistricting following the 2000 Census. ECF No. 30-5, at 7. In fact, at least seven Florida counties adjust census data to exclude prison populations when determining whether there is substantial equality of population across districts. *Id.*

remove or relocate (to their pre-prison residences) prison popula-tions. Robert Groves, *So, How Do You Handle Prisons?*, Director's Blog, U.S. Census Bureau (Mar. 1, 2010), http://directorsblog.blogs .census.gov/2010/03/01/so-how-do-you-handle-prisons/. To facili-tate this, the Census Bureau "releas[ed] early counts of prisoners" following the 2010 Census. *Id.*

The Boards did not use this data. Consistent with the advice received from lawyers and mapping experts, the Boards approved a districting plan that roughly equalized census population—*in-cluding* the JCI population—among the five districts. ECF No. 25, at 5 ¶ 10; ECF No. 24, at 5. The table below summarizes the pop-ulation distribution among districts both including and excluding the prison population. The "ideal" district size in each case is simply one-fifth of the total population, meaning one-fifth of the census population or one-fifth of the nonprisoner population.

| District | Census Population | Deviation from Ideal | Population w/o Prison | Deviation from Ideal |
|----------|-------------------|----------------------|-----------------------|----------------------|
| 1 | 2979 | 0.91% | 2979 | 9.48% |
| 2 | 2822 | -4.40% | 2822 | 3.71% |
| 3 | 3070 | 4.00% | 1913 | -29.69% |
| 4 | 3073 | 4.10% | 3073 | 12.94% |
| 5 | 2817 | -4.57% | 2817 | 3.53% |

*See* ECF No. 30-1, at 13–14. JCI's inmates were all counted as part of District 3.

This data can be used to compute a measure of population equality for the districting scheme called the "total deviation" or "overall deviation." *Id.* at 13 n.7; *see also Daly v. Hunt*, 93 F.3d 1212, 1215 n.2 (4th Cir. 1996). This measure is computed by summing together the absolute values of the percent deviations for the smallest and largest districts.[3] ECF No. 30-1, at 13 n.7. The larger the total deviation, the less equality of population exists across districts. If it is proper to include prisoners in the total population count, then the districts as drawn by the Boards have a total deviation of 8.67%. If, on the other hand, the prisoners should not be counted when assessing substantial equality of population across districts, then the total deviation is 42.63%.

### C. The Present Litigation, Including Threshold Matters

#### 1. *Nature of this Suit*

Plaintiffs brought suit in March 2015, a little over a year after the Boards approved the new districting scheme. ECF No. 1.

---

[3] In math terms: *total deviation* $\% = 100 \frac{|\max(n_i - n_{ideal})| + |\min(n_i - n_{ideal})|}{n_{ideal}}$, where $n_{ideal}$ is the size of an ideal district and $i$ is taken over the set of $N$ districts $i$=1, 2, ... $N$.

The gist of Plaintiffs' claim is that the districting scheme dilutes their voting power and "political influence," thereby denying them equal protection of the laws in violation of the Fourteenth Amendment. ECF No. 1, at 9 ¶ 43. Although the districts contain roughly equal numbers of "census persons," Plaintiffs claim that the inclusion of all of the JCI inmates in the population base in one district effectively weighs the votes of the (nonprisoner) voters of that district more heavily than Plaintiffs' votes, and also gives the nonprisoners living in that district greater political influence. *Id.* This, according to Plaintiffs, violates the "one person, one vote" principle and thus the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 9 ¶¶ 42–43. Plaintiffs do *not* argue that, as a legal matter, the Equal Protection Clause forbids state and local governments from counting prisoners when redistricting; rather, Plaintiffs argue that the effect of the Boards' decision to count prisoners under the circumstances of this case has resulted in an Equal Protection violation. ECF No. 30, at 12.

Plaintiffs seek declaratory and injunctive relief. ECF No. 1, at 9–10. Specifically, Plaintiffs seek (1) a declaration that the current districting scheme violates the Equal Protection Clause; (2) an injunction preventing Defendants from conducting elections for

the Boards under the current scheme; (3) if Defendants cannot develop a scheme that passes constitutional muster, an injunction compelling Defendants to use a districting scheme fashioned by this Court. *Id.*

Each party has moved for summary judgment. ECF Nos. 24 & 30. After a hearing, I determined that the record needed more information about whether the inmates possess a "representational nexus" with the Boards. ECF No. 43. The parties supplemented the record, and it is now possible for me to rule on the motions for summary judgment.

## 2. *Parties and Standing*

Plaintiff Kate Calvin is a registered voter living in District 2 in Jefferson County. ECF No. 21, at 3 ¶ 7. She participated as a citizen in the redistricting efforts, attending at least one meeting of the Board of Commissioners and engaging an expert to help determine the feasibility of removing JCI inmates from the population base. *Id.* at 5 ¶ 32; ECF No. 30-1, at 28. Plaintiff John Nelson is the former County Commissioner for District 2, and still resides there. ECF No. 21, at 3 ¶ 8. When he was on the Board of Commissioners, he voted against the redistricting plan that was eventually adopted. *Id.* at 5 ¶ 33. Plaintiff Charles J. Parrish is a resident of

11

District 4 and is registered to vote in Jefferson County. *Id.* at 3 ¶ 9. Plaintiff Lonnie Griffin is a resident of District 1 and is registered to vote in Jefferson County. *Id.* at 3 ¶ 10. Plaintiff Concerned United People is, by its description, "a not-for-profit organization based in Jefferson County . . . [whose] mission is to serve the needs of Jefferson County residents, particularly the African-American community." ECF No. 1, at 4 ¶ 11.

The Boards have already been introduced, and more will be said later about their responsibilities and powers under Florida law. The remaining defendant is Marty Bishop, the Supervisor of Elections for Jefferson County. ECF No. 21, at 5 ¶ 14. He is sued in his official capacity. *Id.*

Defendants have not challenged any of the plaintiffs' Article III standing to bring this lawsuit, but of course standing "implicates . . . subject matter jurisdiction, and accordingly must be addressed as a threshold matter regardless of whether it is raised by the parties." *Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.,*

797 F.3d 1248, 1271 (11th Cir. 2015) (quoting *Nat'l Parks Conservation Ass'n v' Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003)).[4] Calvin, Parrish, and Griffin are all voters in districts that are allegedly overpopulated, and therefore they have standing. *See Fairley v. Patterson*, 493 F.2d 598, 603 (5th Cir. 1974).[5] And there the standing inquiry ends—as long as "one named plaintiff . . . ha[s] standing for each . . . claim[]," there is a case or controversy within the meaning of Article III. *Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1536–37 (11th Cir. 1994).

## II.   LEGAL BACKGROUND

### A. The Evolution of the Right to Vote

The Constitution as ratified in 1788 did not bestow a right to vote on all citizens of the United States. *See Minor v. Happersett*, 88 U.S. 162, 170–73 (1874). The individual states were responsible for determining which citizens would be granted the power to vote,

---

[4] Maybe "must" is a little strong—after all, courts routinely neglect to "address" standing. *See, e.g.*, *Mech v. Sch. Bd. of Palm Beach Cty.*, 806 F.3d 1070 (11th Cir. 2015). It's probably more accurate to say that a court must be sure that there is standing, and if it's arguable that there is not standing, the court should explicitly "address" the issue.

[5] Decisions of the Fifth Circuit handed down prior to September 30, 1981 are binding as precedent within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

and from the outset different states made different choices. Connecticut required voters to be "quiet and peaceable." *Id.* at 172. Massachusetts required voters to have "a freehold estate within the [state] of the annual income of three pounds, or any estate of the value of sixty pounds." *Id.* Nearly all states required voters to be male. *Id.* at 172–73.

The Fourteenth and Fifteenth Amendments, ratified in 1868 and 1870, respectively, didn't change things right away. In *Happersett*, the Supreme Court held that the Fourteenth Amendment did not automatically grant women the right to vote. 88 U.S. at 178. And in *United States v. Cruikshank*, the Court held that the Fifteenth Amendment granted a right of "exemption from discrimination in the exercise of the elective franchise on account of race," but that it did *not* grant a right to vote. 92 U.S. 542, 555–56 (1875).

Technically, these holdings are still good law—there is no free-floating "right" to vote protected by the U.S. Constitution in the same sense that there's a right to free speech or a right to be free from unreasonable searches and seizures. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam) ("The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature

chooses a statewide election as the means to implement its power to appoint members of the electoral college."); *Hoch v. Phelan*, 796 F. Supp. 130, 132 (D.N.J. 1992) (noting that "the U.S. Constitution does not guarantee the right to vote in state elections"). But what has changed dramatically since the time of *Hapersett* are the limitations the Equal Protection Clause places on states' ability to choose *who* may vote. Once a state chooses to let any particular group or class of people vote, it may not deny the vote to others in a way that denies them equal protection of the laws. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966). So even though there's not a right to vote in the strictest sense of the term "right," both courts and citizens can regularly speak of the "right to vote," and even characterize it as fundamental, *see, e.g.*, *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003), without being incorrect in any way that matters for practical purposes.

## B. The Development of "One Person, One Vote"

The Supreme Court recognized relatively early that outright denial of the ability to vote—even in a primary election—could violate the Equal Protection Clause. *See Nixon v. Herndon*, 273 U.S. 536, 540–41 (1927). But for many years the Court was unwilling to

apply an equal protection analysis to claims of vote *dilution* result-ing from malapportioned legislative districts. In 1946, the Court expressly held in an opinion by Justice Frankfurter that such claims were "of a peculiarly political nature and therefore not [fit] for judicial determination." *Colegrove v. Green*, 328 U.S. 549, 552 (1946). The *Colegrove* Court distinguished *Herndon* and similar cases from the districting/dilution claim before it (which involved Illinois' Congressional districts) as follows:

> This is not an action to recover for damage because of the discriminatory exclusion of a plaintiff from rights enjoyed by other citizens. *The basis for the suit is not a private wrong, but a wrong suffered by Illinois as a polity.* . . . In effect this is an appeal to the federal courts to reconstruct the electoral process of Illinois in order that it may be adequately represented in the councils of the Nation. Because the Illinois legislature has failed to revise its Congressional Representative districts in order to reflect great changes, during more than a generation, in the distribution of its population, we are asked to do this, as it were, for Illinois.

*Id.* (emphasis added).

I quote from this opinion at length because it represents a view that has been emphatically rejected, and so it offers valuable clues as to what errors should be avoided when thinking about di-lution claims. The chief error in the majority opinion in *Colegrove*

was the failure to recognize the personal nature of the rights at stake. As Justice Black recognized in his dissent in *Colegrove* (which was joined by Justice Douglas):

> No one would deny that the equal protection clause would . . . prohibit a law that would expressly give certain citizens a half-vote and others a full vote. The probable effect of the [districting scheme at issue] in the coming election will be that certain citizens, and among them the petitioners, will in some instances have votes only one-ninth as effective in choosing representatives to Congress as the votes of other citizens. Such discriminatory legislation seems to me exactly the kind that the equal protection clause was intended to prohibit.

*Id.* at 569 (Black, J., dissenting).

The view of Justices Black and Douglas won out, though it took over 15 years. Black and Douglas reiterated their opposition to the so-called "political question" holding of *Colegrove* in their dissent in *South v. Peters*, arguing that "[t]he right to vote includes the right . . . to have the vote counted at full value without dilution or discount." 339 U.S. 276, 279 (1950) (Douglas, J., dissenting). Finally, in *Baker v. Carr*, the Court adopted this view, holding that vote dilution claims could be brought under the Equal Protection Clause. 369 U.S. 186, 237 (1962).

17

In *Carr*, the Court only answered the question of *whether* vote dilution claims based on malapportionment were justiciable, not how to analyze such claims. The Court tackled the latter question in *Wesberry v. Sanders*, 376 U.S. 1 (1964), and *Reynolds v. Sims*, 377 U.S. 533 (1964).[6] *Wesberry* dealt with malapportionment of congressional districts, 376 U.S. at 2, while *Reynolds* dealt with malapportionment of state legislative districts, 377 U.S. at 536–38. In each case, the Court held that large disparities among the number of people living in different legislative districts violated the Constitution. But the Court concluded that malapportionment of congressional districts offends Article I, § 2 of the Constitution,[7] *Wesberry*, 376 U.S. at 17–18, while malapportionment of state legislative districts offends the Equal Protection Clause, *Reynolds*, 377 U.S. at 568. This difference has turned out to have an im-

---

[6] The Court first used the precise phrase "one person, one vote" in *Gray v. Sanders*, a case involving Georgia's odd system for electing United States Senators and certain state officials. 372 U.S. 368, 370–72 (1963). The Court took pains to point out that *Gray* was not a case about apportionment, but the logic of the opinion, and particularly the Court's conclusion that "[t]he conception of political equality . . . can mean only one thing—one person, one vote" clearly led to *Reynolds* and *Wesberry*.

[7] Technically, Article I, Section 2 as amended by Section 2 of the Fourteenth Amendment, which effectively repealed the Three-Fifths Clause. *See Chen v. City of Houston*, 206 F.3d 502, 527 n.20 (5th Cir. 2000).

portant consequence: the Court has tolerated much larger devia-
tions in total census population among state legislative districts
than among congressional districts. *See, e.g.*, *Mahan v. Howell*, 410
U.S. 315, 322–23 (1973). The Court extended *Reynolds* to units of
local government (county commissions, etc.) in *Avery v. Midland
County*, holding that "units with general governmental powers
over an entire geographic area [must] not be apportioned among
single-member districts of substantially unequal population." 390
U.S. 474, 485–86 (1968).

One thing this discussion of the history of one person, one
vote makes clear is that the injury in a case involving malappor-
tioned districts is *personal*, not structural.[8] The constitutional in-
firmity in a set of malapportioned legislative districts lies not in
the failure to equalize some population measure, but in the in-
fringement of some peoples' rights to participate in our form of rep-
resentative democracy. Put another way, when a suit challenging
a districting scheme reaches federal court, the court does not sit as

---

[8] *But see* Joseph Fishkin, *Weightless Votes*, 121 Yale L.J. 1888 (2012)
(arguing that in one person, one vote cases, "the real action is not in the domain
of individual rights, but rather in structural questions about the allocation of
group political power").

a super-legislature to question the districting choices of the legislative body from a policy standpoint. Rather, the court functions in its traditional role as a vindicator of individual rights.

In the 50-plus years since *Reynolds v. Sims*, this principle has sometimes been obscured. On occasion courts seem to focus on equalizing census population across districts as an end in and of itself. *See, e.g.*, *Cummings v. Meskill*, 341 F. Supp. 139 (D. Conn. 1972) (three-judge panel), *rev'd sub nom. Gaffney v. Cummings*, 412 U.S. 735 (1973). And courts, including the Supreme Court, have also spent much energy fleshing out the doctrine regarding the other side of the constitutional balance—the legitimacy and importance of the reasons offered up by governments to justify disparities in the size of districts. *See, e.g.*, *Davis v. Mann*, 377 U.S. 678, 691–92 (1964). It's easy to lose sight of the fact that the rights at stake in one person, one vote cases "are personal and individual," *South*, 339 U.S. at 280 (Douglas, J., dissenting), but it's also vital that this fact not be forgotten.

### C. One Person, One Vote Mechanics

For cases involving state and local governmental bodies, a one person, one vote claim requires an inquiry into whether the apportionment scheme being challenged "may reasonably be said

to advance [a] rational state policy and, if so, whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits." *Larios v. Cox*, 300 F. Supp. 2d 1320, 1341 (N.D. Ga. 2004) (three-judge panel), *aff'd mem.* 542 U.S. 947 (2004) (citations and quotations omitted). In practice, the first question usually asked is "how large are the population disparities?"

One measure of population disparities is the "total deviation" or "overall deviation" described above in Part. I.B. If the total deviation is under 10%, the population disparities are considered "minor," and a plaintiff will generally have to provide further proof (besides the disparities themselves) showing that the districting scheme is arbitrary or discriminatory in order to prevail. *See Daly*, 93 F.3d at 1220. If the total deviation is above 10%, the state or local government must justify the disparities or else the scheme will be invalidated. *See Larios*, 300 F. Supp. 2d at 1340. Courts sometimes refer to this burden-shifting approach to one person, one vote claims as the "safe harbor rule," though that moniker can be misleading since deviations below 10% may still violate one person, one vote. *See Frank v. Forest Cty.*, 336 F.3d 570, 572–73 (7th Cir. 2003) (Posner, J.). A state or local government may be able to

justify a districting scheme with a relatively large total population deviation by invoking one or more of a number of well-recognized state interests, including the interests in "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent [r]epresentatives." *Karcher v. Daggett*, 462 U.S. 725, 740 (1983).

In the typical one person, one vote case—which this case is not—the question of what constitutes the "population" for purposes of computing the total population deviation is not at issue. There are really two questions embedded in this question, one theoretical and one practical. First, who are the people who should *in theory* be counted for determining equality of population? Second, what source(s) of data are acceptable for determining this population? I'll get to the first question soon enough. As for the second question, the Supreme Court has long endorsed the use of census data as a basis for drawing legislative districts, even while acknowledging the shortcomings of that data. "[T]he census data provide the only reliable—albeit less than perfect—indication of . . . districts' 'real' relative population levels. Even if one cannot say with certainty that one district is larger than another merely because it has a higher census count, one can say with certainty that

the district with a larger census count is more likely to be larger than the other district than it is to be smaller or the same size. That certainty is sufficient for decisionmaking." *Id.* at 738.

But while census data is almost always the starting point for determining a population base, it need not, and in some cases cannot, be the ending point. The Court has recognized that blind reliance on census data can lead to unconstitutional results. In *Mahan v. Howell*, for instance, the Court considered a districting plan that relied on census data to count some 36,000 military personnel in the state senate district where they were "home-ported"—that is, the district containing their naval base. 410 U.S. at 330–31. However, only about half of these people actually lived in the district, either on the naval base or off the base but still within the district. *Id.* The Court held that the scheme was unconstitutional. The scheme "resulted in . . . significant population disparities," and the state could not fall back on its reliance on census figures to justify these disparities because "[t]he . . . use of [a] census enumeration to support a conclusion that all of the Navy personnel on a ship actually resided within the state senatorial district in which the ship was docked placed upon the census figures a weight that they were not intended to bear." *Id.*

23

More recently, courts have allowed states to alter census data by assigning prisoners to their pre-incarceration places of residence or removing them from the population base for districting purposes. *See Fletcher v. Lamone*, 831 F. Supp. 2d 887, 894–97 (D. Md. 2011) (three-judge panel), *aff'd mem.* 133 S. Ct. 29 (2012). In allowing this, the *Fletcher* court emphasized that "a State may choose to adjust the census data, so long as those adjustments are thoroughly documented and applied in a nonarbitrary fashion and they otherwise do not violate the Constitution." *Id.* at 894–95. In the context of prisoners, the court noted that such adjustments might be appropriate because "prisoners are counted [by the Census Bureau] where they are incarcerated for pragmatic and administrative reasons, not legal ones." *Id.* at 895.

### III.   WHAT DOES ONE PERSON, ONE VOTE MEAN?

#### A. The Personal Rights and Interests Protected By "One Person, One Vote"

The early one person, one vote cases identified two distinct personal interests that are negatively impacted by malapportionment. First, there is obviously the right or interest in voting and in having one's vote counted on an equal basis with others. *See*

*Reynolds*, 377 U.S. at 568 ("an individual's right to vote . . . is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State"). Second, there is the interest in being represented on an equal footing with one's neighbors. *See, e.g.*, *Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1969) ("Equal representation for equal numbers of people is a principle designed to prevent debasement of voting power *and diminution of access to elected representatives*.") (emphasis added). Lower courts have since labeled these rights—or, more precisely, the principles related to these rights—"electoral equality" and "representational equality." *See, e.g.*, *Chen v. City of Houston*, 206 F.3d 502, 525 (5th Cir. 2000). An apportionment scheme that effectively weighs one voter's vote more heavily than another's can be said to violate the principle of electoral equality, while an apportionment scheme that effectively gives one denizen[9] greater "representational strength" than another can be

---

[9] The term "denizen" is used here and throughout this opinion to mean one who lives in a district and is represented by an elected official, whether or not he or she votes or is entitled to vote. This term has significant advantages over "constituent," which can refer either to someone entitled to vote for a representative *or* to someone represented by a representative whether or not he or she is entitled to vote. *See Constituency*, Black's Law Dictionary (9th ed. 2009) ("1. The body of citizens dwelling in a defined area and entitled to elect a representative. 2. The residents of an electoral district."). Denizen is also preferable to "citizen," which of course carries with it a legal meaning that

said to violate the principle of representational equality. And when these principles are violated, it means that some people—those living in districts with too many people, typically—are denied equal protection of the laws.

Although these principles are distinct, the Supreme Court seemed to discuss them interchangeably in the early cases. This is perhaps because those cases involved districts with wide disparities in total population *and* voter population, so the districting schemes at issue violated both principles. *See Chen*, 206 F.3d at 525–26; *Daly*, 93 F.3d at 1223. Only a handful of cases have dealt with the vexing problem of what to do when districts are drawn in such a way so as to serve one principle but not the other—that is, when districts are drawn in such a way that the number of voters is the same in each, but the number of total people varies by a great amount (or the other way around).

The first of these cases was *Burns v. Richardson*, 384 U.S. 73 (1966), which involved an interim districting plan for Hawaii's state legislature. The plan used registered voters as a population

---

might be misleading in the context of this case. The term "voter" is used throughout this opinion to mean one who is entitled to vote in a jurisdiction, whether or not she actually votes. I will occasionally use "constituent," and when it is used, it has the same meaning as denizen.

base rather than census data—that is, it attempted to roughly equalize the number of registered voters per representative across the legislative districts. 384 U.S. at 86–91. Because of the presence of a large number of military personnel stationed in Hawaii but not registered to vote there, the use of such a base led to "sizable differences in results [compared to those] produced by the distribution according to the State's total population, as measured by the federal census figures." *Id.* at 90.

The Supreme Court upheld the interim scheme against a "one person, one vote" challenge. In doing so, it clarified that "the Equal Protection Clause does not *require* the States to use total population figures derived from the federal census as the standard by which . . . substantial population equivalency is to be measured." *Id.* at 91 (emphasis added). The Court further noted the following:

> [T]his Court [has never] suggested that the States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured. The decision to include or exclude any such group involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere. Unless a choice is

27

> one the Constitution forbids, . . . the resulting appor-
> tionment base offends no constitutional bar, and com-
> pliance with the rule established in *Reynolds v. Sims*
> is to be measured thereby.

*Id.* at 92 (citations omitted). Because the use of registered voters as a population base appeared to lead to similar results as would have been achieved "had state citizen population been the guide," the Court held that the scheme complied with one person, one vote. *Id.* at 92–96.

The lower courts have interpreted *Burns* in strikingly different ways. The Ninth Circuit decision in *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), contains two such interpretations in its majority and dissenting opinions. *Garza* involved the redrawing of the districts for the Los Angeles County Board of Supervisors. 918 F.2d at 765. Because Los Angeles County contained a large number of nonvoters, using total population (census population, roughly speaking) as a base led to drastically different results than using voter population as a base. *Id.* at 773–74. The County, citing *Burns*, argued that the districting plan (which had been ordered by the district court) violated one person, one vote by giving voters living in districts with large populations of nonvoters more voting strength than voters in other districts. *Id.* at 773.

28

The majority in *Garza* not only rejected the argument that voter population was the relevant population to be equalized under *Reynolds*, but actually went so far as to suggest that equalizing voter population would *violate* one person, one vote by impairing the ability of nonvoters to access and petition their representatives. *See id.* at 774–76. The majority, despite its description of "protect[ing] the voting power of citizens" and "ensur[ing] equal representation for equal numbers of people" as "coequal goals," basically held that representational equality trumps electoral equality. *See id.*

Judge Kozinski dissented in relevant part. After a lengthy review of the Supreme Court's one person, one vote jurisprudence, Judge Kozinski "concluded that it is the principle of electoral equality that lies at the heart of one person one vote." *Id.* at 785 (Kozinski, J., dissenting in relevant part). Still, Kozinski admitted that his "colleagues may ultimately have the better of the argument" and that the Supreme Court, if confronted directly with the issue, might go either way. *Id.*

Two other Circuit Courts of Appeals have considered cases pitting electoral equality against representational equality and

drawn different lessons from *Burns* than either the majority or dissent in *Garza*. In *Daly v. Hunt*, the Fourth Circuit considered a challenge to the districting scheme for a board of county commissioners and a school board. 93 F.3d at 1214. The court rejected both the *Garza* majority's approach and Judge Kozinski's approach, concluding instead that courts should defer to a state or local government's decision to favor electoral or representational equality when both cannot be achieved. *See id.* at 1225–27. The court reasoned that because districting is "inherently political," courts (particularly federal courts) should be wary of interfering with choices about what theory of representative democracy a state or local government chooses. *See id.* The Fifth Circuit more or less followed the Fourth Circuit's lead in *Chen v. City of Houston*, 206 F.3d 502 (2000).[10]

---

[10] More recently, a three-judge District Court followed the reasoning of *Chen* and *Daly* and rejected a challenge to Texas' state senate districting scheme on the grounds that it diluted voters' votes by including large groups of nonvoters in the population base. *Evenwel v. Perry*, No. A14CV335, 2014 WL 5780507 (W.D. Tex. Nov. 5, 2014), *prob. juris. noted Evenwel v. Abbott*, 135 S. Ct. 2349 (2015). That case is on appeal to the Supreme Court; oral arguments were held on December 8, 2015. *See Argument Transcripts*, Supreme Court of the United States, http://www.supremecourt.gov/oral_arguments/argument _transcript/2015 (last visited Mar. 17, 2016).

For reasons discussed later on, I need not decide whether Judge Kozinski, the *Garza* majority, or the *Daly* court is correct. That said, the best answer is probably that the Equal Protection Clause (through the one person, one vote principle) protects *both* representational *and* electoral equality. If a state or local government chooses a population base that appears to serve either one of these principles, or even one that serves both imperfectly, it is not the job of a court to step in and enforce its particular theory of representative democracy. If a state or local government is confronted with a situation in which it *knows* that it can't serve both principles—in other words, in which it knows that it will have to draw districts in a way that dilutes some voters' voting strength or some denizens' representational strength—then the choice of which principle should prevail is one for the state or local government.

There's another point which bears mentioning. State and local governments (or whoever conducts redistricting activities) don't actually pick a theory of representative democracy; rather, they draw district lines. Ultimately, to determine whether one person, one vote principles have been violated, it is necessary to look at the population base that's been chosen, because there is no way to directly measure vote dilution or representational harm. That's

why courts seem to focus so much on the structural question of whether a particular population base is appropriate—it's the only thing that can be measured. But as discussed above in Part II.C, census data is imperfect, and other data (data on registered voters, for instance) is even worse. *See generally* Nathaniel Persily et al. as *Amici Curiae* in Support of Appellees, *Evenwel v. Abbott*, No. 14-940 (U.S. Sept. 25, 2015). The result of all this is that there is (and should be) a reluctance *on evidentiary grounds* to find that the choice of a particular population base violates one person, one vote. That is, it's hard to prove that the choice of a particular population base for redistricting leads to vote dilution and/or dilution of representational strength. The *Daly* court recognized this evidentiary problem and cited it alongside the federalism/judicial restraint rationale as a reason for being wary of interfering with a state or local government's choice of population base. *See Daly*, 93 F.3d at 1227–28.

So courts should probably be reluctant to interfere with a state or local government's districting scheme on the grounds that

it uses the "wrong" population base.[11] But that doesn't mean that a court should *never* interfere. In particular, *Burns* still counsels that the choice of apportionment base can't be "one the Constitution forbids," 384 U.S. at 92, a somewhat circular command that will be discussed later. For now, though, it's necessary to look more closely at something acknowledged as a key concern in *Garza*, *Daly*, and *Hunt*—representational equality.

## B. The Nature of Representational Equality and the "Right" to be Represented

*Garza*, *Hunt*, and *Daly* showcase at least three different theories of what one person, one vote means. But all of these theories—even Judge Kozinski's voter-centric theory articulated in his *Garza* dissent—recognize that the choice to use voter population as a population base when there are large pockets of nonvoters costs those nonvoters something. In other words, all three theories recognize "representational equality" as a real concern to be taken into account in one person, one vote cases. Furthermore, these

---

[11] It's possible that things are different for congressional districts. It's difficult to read *Wesberry*—and the constitutional provisions on which it relied—and conclude that drawing congressional districts so as to achieve electoral equality would be permissible. Article I, Section 2 (as amended by the Fourteenth Amendment) seems to mandate that representational equality be the guiding principle for congressional districting. *See* Brief of the ACLU and the ACLU of Texas as *Amici Curiae* in Support of Appellees at 7–13, *Evenwel v. Abbott*, No. 14-940 (U.S. Sept. 24, 2015).

cases make clear that representational equality is not a structural or administrative state interest (like preserving county lines, etc.) that justifies deviations in the number of voters, but rather a principle that reflects the existence of an underlying *personal* interest or right in being represented.

This is not an interest or right—I'll call it a right, though for purposes of this case it doesn't matter[12]—often discussed by courts. Its contours are usually not particularly germane in one person, one vote cases, and certainly not outcome-determinative. But understanding this right is crucial to deciding this case, so it is necessary to glean its rough outline. That outline is best elucidated by investigating two questions. First, what does a representative *do* for those he represents? Second, in what ways (besides voting) can someone affect the performance of the representative's functions?

---

[12] Whether the existence of representational equality as a valid constitutional concern implies that there exists an individual, legally cognizable *right* to be represented is an open question. Would a nonvoter in a district with an excess of people have standing to bring an Equal Protection claim alleging dilution of her "representational strength" just as a voter in such a district would have standing to bring an Equal Protection challenge alleging dilution of her vote? Frankly, it's hard to see why not, though that view is not universally shared. *See* Brief for Appellants at 38–40, *Evenwel v. Abbott*, No. 14-940 (U.S. July 31, 2015) (arguing that none of the Supreme Court's decisions "suggest (let alone hold) that a resident's diluted access to his or her representative is a 'legally cognizable injury' within the meaning of the one-person, one-vote rule").

(Or, put another way, what does the represented do for or to their representative?)

### 1. What Does a Representative Do?

In broad terms,[13] a representative does three key things for her constituents. First, she helps make and/or influence policy decisions, such as passing (or not passing) laws and choosing or approving administrative officials. Sometimes the effects of those decisions will be direct—a representative votes to make a county "dry," thereby forcing bars in the area to close and affecting the livelihood of some denizens. Other times the effects will be more indirect—a representative supports a sales tax hike to fund county schools, which enables a local high school to provide its teachers with better equipment, which leads to a better-educated workforce, which increases the earning power of the denizens of the community. The policy choices made by the representative may reflect the will of her constituents, or they may reflect the representative's

---

[13] There is a rich social science literature on the nature of representation. *See generally Political Representation*, Stanford Encyclopedia of Philosophy (Oct. 17, 2011), http://plato.stanford.edu/entries/political-representation/. This case doesn't require diving into the literature, as all that's needed for present purposes is a rough outline of the "right to be represented."

own determination as to what's best for her constituents,[14] or (more cynically) they may reflect the will of powerful special interests, or caprice, or bias.

Second, a representative acts as an "ombudsperson[,] [a] friend and guide in the complex channels of . . . government" for her constituents. *See Rossito-Canty v. Cuomo*, 86 F. Supp. 3d 175, 181–82 (E.D.N.Y. 2015). As one esteemed judge[15] has noted in the context of congressional representatives, a constituent "frustrated by the lack of an appropriate response with respect to a welfare payment, aid to small business in sending its products abroad, tax

---

[14] "Your representative owes you, not his industry only, but his judgment; and he betrays, instead of serving you, if he sacrifices it to your opinion." 2 Edmund Burke, *Speech to the Electors of Bristol*, *in* The Works of the Right Honorable Edmund Burke 89, 95 (1774), http://www.gutenberg.org/files/15198/15198-h/15198-h.htm. Burke's "trustee" model of representation can be contrasted with the "delegate" model of representation, in which a representative merely enacts her constituents' preferences. *See generally* Frederick Schauer, *Constitutions of Hope and Fear*, 124 Yale L.J. 528, 533–34 (2014). Obviously in practice most representatives fall somewhere between pure trustee and pure delegate. Indeed, Madison and Hamilton seemed to contemplate representation as encompassing both delegate- and trustee-like features. *See* Cass R. Sunstein, *Interest Groups in American Public Law*, 38 Stan. L. Rev. 29, 40–43 (1985).

[15] The judge in the *Rossito-Canty* case was Senior Judge Jack Weinstein, a legendary trial judge who literally wrote the book on evidence. *See* Jack B. Weinstein et al., Evidence: Cases and Materials (9th ed. 1997). Before he was appointed to the bench by President Johnson in 1967, Weinstein assisted the plaintiffs in *Brown v. Board of Education*, 347 U.S. 483 (1954), and wrote a brief in support of the appellants in *WMCA, Inc. v. Lomenzo*, 377 U.S. 633 (1964), one of the early one person, one vote cases. *See* Jack B. Weinstein, *The Role of Judges in a Government of, by, and for the People: Notes for the Fifty-Eighth Cardozo Lecture*, 30 Cardozo L. Rev. 1 (2008).

collections, or other matters[ may] turn[] for help to the Representative from the district" in which he lives. *Id.* Certainly the channels of government are less complex at the county level than at the national or state level, but there are still a host of things that a county representative can help her constituents with that have nothing to do with policymaking.[16]

Third, a representative acts as the voice of her constituents in the legislative body. This is related to, but distinct from, her role as a policymaker. There may be situations in which a representative is unable to influence policy, but can still articulate the interests of her constituents. Acting as a mouthpiece for views that are unlikely to prevail in the short term has an important instrumental function—this year's minority view may yet garner a majority—and also arguably has an expressive element separate and apart from any policy-related utilitarian benefit. *See generally* Steven N. Sherr, *Freedom and Federalism: The First Amendment's Protection of Legislative Voting*, 101 Yale L.J. 233 (1991).

---

[16] Consider, for example, Leon County Commissioner Bryan Desloge. Desloge, the Commissioner for District 4 in Leon County, used to publish a newsletter ("Bryan's Brief") in which he sometimes informed his constituents that he was available to help them with issues related to solid waste collection. Bryan Desloge, *Bryan's Brief* (Feb. 2014), https://cms.leoncountyfl.gov/Portals/0/CountyCommission/District4/Newsletters/201402.pdf.

## 2. *The Role of the Represented*

The most obvious way someone can influence his representative is through voting. But voting is not the beginning and end of citizenship, just as campaigning and being elected is (hopefully) not the beginning and end of public service. Especially at the local level, the people ostensibly represented by a legislator have opportunities to engage with that legislator in multiple ways, both official and unofficial, to try to influence the representative's decisions. People write letters and mount protests, but they also take more subtle measures—they invite representatives to tour their neighborhoods; they exploit personal connections to gain greater access to representatives or to put pressure on representatives to take certain actions; and, of course, they give money.

Some courts have tied such activities to the First Amendment right to petition. *See Garza*, 918 F.2d at 775. Even given the preeminent place the First Amendment occupies in the fabric of our democracy, that may be understating the importance of these activities. "[I]t is essential to liberty that the government in general should have a common interest with the people, [and] it is particularly essential that" a legislative body elected directly by the people "should have an immediate dependence on, and an intimate

sympathy with, the people." The Federalist No. 52, at 361 (James Madison) (Benjamin Fletcher Wright ed., 1961). Besides voting, the best way to ensure that a representative has "an intimate sympathy with" those she represents is to protect the ability of the represented to access and influence her. This goes beyond the First Amendment right to petition, and touches on something even deeper—the nature of a representative form of government. *Cf. Cruikshank*, 92 U.S. at 553 ("The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.").

## C. Representational Injuries Caused By Malapportionment

With a better grasp of the nature of the right to be represented, it's possible to understand how malapportionment negatively affects that right. The most commonly cited harm to denizens in a district with too many people is the harm of "dilute[d] . . . access . . . to their representative." *Garza*, 918 F.2d at 775. This "access harm" would affect the right to be represented in multiple ways. Most obviously, it would infringe on the ability to influence representatives' policy choices. It would also diminish the ability

to use representatives as ombudspersons, and it would limit the ability of representatives to voice all their constituents' views.

But as the Fourth Circuit noted in *Daly*—and as the discussion above makes clear— "the right to petition one's representative is but one facet of the concept of representation," *Daly*, 93 F.3d at 1226, and the harm flowing from malapportionment is greater than just the harm of diminished ability to access or petition one's representative. Judge Kozinski identified a second type of harm in his *Garza* dissent. "[A]ssuming that elected officials are able to obtain benefits for their districts in proportion to their share of the total membership of the governing body," a representative with a larger number of denizens in her district will bring home a lower level of services per denizen. *See Garza*, 918 F.2d at 781 (Kozinski, J., dissenting in relevant part).

In addition, a representative with a relatively large constituency is likely to have a wider range of interests, and even some internal conflicts, within that constituency, making it more difficult to determine which policy choices would benefit her constituents the most. Her effectiveness as a representative may be impaired by the need to familiarize herself with and reconcile this

larger set of (possibly competing) interests. *See* Nicholas O. Steph-anopoulos, *Spatial Diversity*, 125 Harv. L. Rev. 1903, 1919–20, 1944–46 (2013) (discussing how a larger variety of interests within a district impairs the ability of an elected official to represent her constituents' views); *cf.* The Federalist No. 56, at 379–83 (James Madison) (Benjamin Fletcher Wright ed., 1961) (arguing that a ra-tio of one member of the House of Representatives to every 30,000 inhabitants would be large enough to ensure that each representa-tive would "be acquainted with the interests and circumstances of his constituents").

Finally, there's the harm that occurs as a result of having the same "power"—that is, one vote in the legislative body—spread over a larger number of people. "Although the overall power of [a] governing body is generally not divisible, each representative indi-vidually should have the same ability to influence the actions per-formed by the governing body as a whole. These representatives should represent roughly the same number of constituents, so that each person, whether or not they are entitled to vote, receives a fair share of the governmental power, through his or her repre-sentative." *Daly*, 93 F.3d at 1226; *see also Wesberry*, 376 U.S. at 14–15 (discussing the evils of the old British system in which some

small villages enjoyed much smaller inhabitant-to-representative ratios than large cities like London).

Note that all of these harms sound in equal protection because the denizens of a district with a relatively large number of people have *less* access, influence, etc. than those in districts with a smaller population. That is, they have less "representational strength."

## D. The Need for a Representational Nexus

The harms discussed above—reduced access, reduced influence, a reduced portion of government services, less effective representation, and diminished power in the polity as a whole—only occur to people who are meaningfully affected by a representative's actions.[17] If the representative can't make decisions that meaningfully affect *me*; if the representative can't act as *my* ombudsperson because the governing body to which she belongs can't do anything for *me*; if *I'm* not receiving services from the governing body—under these circumstances, there's no representational nexus[18] between the representative and me.

---

[17] The one minor exception being the expressive aspect of a representative's speech on behalf of others.

[18] This term was first used in a reported case by Judge Kozinski. *See Pub. Integrity Alliance, Inc. v. City of Tucson*, 805 F.3d 876, 881 (9th Cir. 2015).

I've been assuming all along that everyone who "lives in" a representative's district has a representational nexus with that representative and is therefore a denizen of that representative's district, and indeed that's a good assumption. If someone is physically located or housed in a particular legislative district, that is almost always a good indication that there's a representational nexus between that person and the representative for the district. But this is a matter of correlation, not causation. A person does not have a representational nexus with a representative *because* of that person's physical location, but rather because of the ability of the representative to meaningfully affect that person's life, and the representative will *normally* have such an ability as to all people physically located in her district.

It's easy to think of situations in which neither physical presence nor representational nexus is present—I don't live in San Francisco, nor do I have much, if any, interest in how San Francisco draws its Board of Supervisors districts—and of course it's

---

He used it to refer to the relationship between an elected official and his constituency: "Given the city's concession that each council member represents all of Tucson, it's clear that the representational nexus runs between the city and the council member, not between the ward and the council member." *Id.* I use it in a slightly different way to mean a relationship between an official and an individual denizen.

easy to conceive of situations in which both are present. There are also certainly situations in which a person arguably has a representational nexus with someone who represents a different jurisdiction. Consider Belleville, Illinois, just across the Mississippi River from St. Louis. About a quarter of working Bellevillians work in St. Louis.[19] One would assume that many Bellevillians are greatly affected by at least some of the decisions made by the Missouri Legislature, and that they probably have a representational nexus with the Missouri state representatives from St. Louis.

This case represents an even odder situation, one in which a group of people lives full-time within the geographical boundaries of a district and yet has little, if any, representational nexus with the representative from that district or the legislative body to which he belongs.

More on that later, though. For now, armed with a better understanding of what the right to representation means, I'll turn to the question of what legal standard should be used to analyze whether inclusion of a particular group in a population base offends the Equal Protection Clause.

---

[19] *See* City of Belleville Comprehensive Plan § 5, pg. 7 (adopted June 16, 2014), http://belleville.net/DocumentCenter/View/1208.

### E.  "A Choice the Constitution Forbids"

The Court in *Burns* emphasized (and the lower courts' decisions in *Daly* and *Chen* confirmed) that states have flexibility in choosing which population should be equalized in drawing districts. The only condition is that the choice cannot be "one the Constitution forbids," *Burns*, 384 U.S. at 92, which on its own is not a very helpful limitation. ("A choice of population base is constitutional unless the Constitution forbids it.") But this language is not the only clue as to what the Court meant. *Burns* itself, the other early one person, one vote cases discussed above, and *Chen*, *Garza*, and *Daly*'s treatment of those cases suggest two different (but ultimately equivalent) methods to determine whether use of a particular population base violates Equal Protection.

#### 1.  The Choice Can't Violate Both Electoral and Representational Equality Principles

Judge Kozinski noted in his *Garza* dissent that "a careful reading of the Court's [one person, one vote] opinions suggests that equalizing total population is viewed not as an end in itself, but as a means of achieving electoral equality." 918 F.2d at 783 (Kozinski, J., dissenting in relevant part). Judge Kozinski was trying to make

the point that electoral equality is more important than representational equality—a point about which this Court expresses no opinion—but he was also arguing that the ultimate injury inflicted by malapportionment is the infringement of individual rights, not the fact of malapportionment itself. As discussed earlier, disparities in total census population are *evidence* that these individual rights are being infringed, but are not in and of themselves unconstitutional. *Cf. id.* (noting that "[t]otal population . . . is only a proxy for equalizing the voting strength of eligible voters").

But which individual rights? Judge Kozinski thought the right "to cast equally weighted votes," and therefore the principle of electoral equality, was of paramount importance, and that the principle of representational equality was "subservient." *Id.* at 782–83. The *Garza* majority disagreed, holding that the need to ensure equal representational rights for nonvoting denizens was more important than ensuring electoral equality. *Id.* at 774–76 (majority opinion). The *Chen* and *Daly* courts in effect held that a state could choose whether to satisfy representational equality or electoral equality—that is, in case of a conflict, a state could decide whether the right to be represented equally or the right to case an equally weighted vote was more important.

What none of these cases held was that a state or local government could draw districts in a way that violates *both* electoral and representational equality. Such a districting scheme would deny *all* denizens of some districts—voters and nonvoters alike—equal protection of the laws. It would of course dilute the voting strength of voters, but it would also dilute the representational strength of those voters *and* of their nonvoting neighbors. A scheme that violates both of these principles is unconstitutional under any interpretation of one person, one vote. *See Davidson v. City of Cranston*, 52 F. Supp. 3d 325, 332 (D.R.I. 2014).

So one "choice the Constitution forbids" is a choice that violates both representational and electoral equality. This brings me back to the "representational nexus" concept. People who lack a meaningful or substantial representational nexus with a given legislative body, or whose representational nexus with that body is substantially attenuated relative to others in the body's jurisdiction, don't "count" for purposes of representational equality—that is, their cognizable representational rights vis-à-vis that body are not affected by the size of that body's districts, nor does their presence affect the representational rights of others. Nonvoters, of course, don't "count" for purposes of electoral equality. Nonvoters

who also lack a meaningful representational nexus don't count *at all*, and including a relatively large, geographically compact group of such people in a district impermissibly dilutes the voting *and* representational strength of people in *other* districts.

### 2. The Choice Can't Discriminate "Arbitrarily"

The second method is more doctrinally orthodox. In *Burns*, the Court cited *Carrington v. Rash*, 380 U.S. 89 (1965), as a case containing an example of a "choice the Constitution forbids," and discussed that same case in a footnote. *See Burns*, 384 U.S. at 92. *Carrington* involved Texas' blanket rule denying all members of the armed services the franchise even when some of those service-men and women would have qualified as residents. 380 U.S. at 91–93. *Burns* pointed to this sort of categorization as arbitrary, as opposed to categorization based on (presumably reasonable) residency requirements. *Burns*, 384 U.S. at 92 n.21 ("The difference between exclusion of all military and military-related personnel, and exclusion of those not meeting a State's residence requirements is a difference between an arbitrary and a constitutionally permissible classification.").

This portion of *Burns* suggests that when choosing to include a group in or exclude a group from its population base for purposes

of districting, a state or local government must not discriminate in violation of the Equal Protection Clause. That is, the choice to include or exclude any identifiable group from the population base must pass muster under the applicable equal protection standard. But how to determine the standard? Although the Court in *Burns* characterized the discrimination in *Carrington* as "arbitrary"—implying that the traditional rational basis/strict scrutiny framework should be applied—it's difficult to see how Texas lacked a rational basis in the traditional sense for denying the vote to members of the military. If the end goal was to ensure that only true residents could vote, then excluding a class of people containing many nonresidents would qualify as rational. *See Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) ("Under rational basis review, a court must accept a legislature's generalizations even when there is an imperfect fit between means and ends.").

The better reading of *Burns*—and a reading more consistent with equal protection jurisprudence in the vote-dilution context—is that choices about whether to exclude a particular group from (or include a group in) the population base are subject to something

more exacting than rational basis review. *Cf. Green v. City of Tucson*, 340 F.3d at 898–900 ("In the absence of a suspect classification, the Supreme Court has applied strict scrutiny to only two types of voting regulations. The first type includes regulations that unreasonably deprive some residents in a geographically defined governmental unit from voting in a unit wide election. . . . The second type are regulations that contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters within the electoral unit."). This is not inconsistent with the statement in *Burns* that "[s]tates are [not] required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed." 384 U.S. at 92. All of the listed groups are by definition not permanent residents, and therefore discrimination on the basis of residency—which is allowed—would exclude them from the population base without any overinclusion of the type found impermissible in *Carrington*.

*Burns* and *Carrington* suggest the following equal protection methodology to determine whether a population base is permissi-

ble. First, start with the census population. It's an imperfect meas-
ure, but it's the traditional starting point for most legislative bod-
ies. *See, e.g.*, *Gaffney v. Cummings*, 412 U.S. 735, 744–49 (1973).

Second, identify any groups to be excluded. A group may be
excluded from the population base if it is not similarly situated to
the remainder of the population either with respect to citizenship
(that is, ability to vote), residency, or denizenship. So, consistent
with *Burns* and *Carrington*, "exclusion of those not meeting a
State's residence requirements" would be proper because such peo-
ple are not similarly situated to residents. On the other hand, ex-
clusion of a group based on some characteristic that might be cor-
related with citizenship, etc.—like military status—is forbidden.
*See Carrington*, 380 U.S. at 93–96; *see also Davis v. Mann*, 377
U.S. at 692. The "fit" has to be fairly good—better than would be
required for rational basis review.

Third, even if no group is sought to be excluded, the census
baseline *itself* must be examined. The Census Bureau does not in-
clude or exclude any group based on any coherent theory of repre-
sentative democracy, but rather makes choices about who to count
and where to count them for reasons of efficiency and administra-
tive ease. *See, e.g.*, *Fletcher,* 831 F. Supp. 2d at 895. It may be the

case that the census count itself makes choices that are inconsistent with the Equal Protection Clause. *See Mahan*, 410 U.S. at 330–31.

In particular, it may be that the census *includes* some group that is not similarly situated to the rest of the populace in any relevant respect. Treating such a group the same as other citizens, denizens, or residents would violate the Equal Protection Clause because "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

Consider in this regard a jurisdiction with a large pocket of nonvoters who also happen to lack a meaningful representational nexus with the local legislative body. This group is not similarly situated to its "neighbors" in terms of residency, citizenship, or denizenship. Treating this group as if it were like the people surrounding it would be just as "arbitrary"—more arbitrary, in fact—than the exclusion of military personnel from the population base on the grounds that they're not really residents.

As promised, then, this second line of thinking leads to the same place as the first—inclusion of a group of nonvoters who also

lack a substantial representational nexus with the relevant legis-
lative body violates one person, one vote if such inclusion seriously
dilutes the voting power and-or representational strength of oth-
ers. This sort of arbitrary (in the *Burns/Carrington* sense of "arbi-
trary," not the "lacking a rational basis" sense of arbitrary) state
action does not pass muster under the Equal Protection Clause.

## IV.   ANALYSIS

### A. The "Safe Harbor" Rule

The peskiest of the pin bones keeping us from the meat of
this case is the so-called "safe harbor" rule, which the parties (par-
ticularly Defendants) devote tremendous energy to discussing.
This rule provides that state and local districting schemes with to-
tal deviations of less than 10% are presumptively constitutional
and represent "the result of an 'honest and good faith effort to con-
struct districts . . . as nearly of equal population as is practicable.'"
*Daly*, 93 F.3d at 1220 (quoting *Reynolds*, 377 U.S. at 577)).

As an initial matter, it should be noted that the safe harbor
rule is not a substantive rule of constitutional law, but rather a
way of determining in one person, one vote cases which party
should bear the burden of proof in demonstrating compliance or
noncompliance with the Constitution. *See, e.g., Larios*, 300 F.

Supp. 2d at 1340–41. "[T]he Supreme Court has not created a 10% maximum population deviation threshold, below which all redistricting decisions are inherently constitutional." *Wright v. North Carolina*, 787 F.3d 256, 267 (4th Cir. 2015). Even assuming that the safe harbor rule were applicable with full force to this case, the fact that the districting scheme has population deviations smaller than 10% does not insulate it from judicial review.

But there are two good reasons why the safe harbor rule is of little use in this case. First, one of the central legal issues in this case concerns the assumptions underlying the rule. If the major factor in determining compliance with one person, one vote is substantial equality of total census population between districts, then *of course* a rule that uses a measure of such equality as a way to determine the likelihood of compliance makes sense. But one of the issues here is *whether* substantial equality of total census population between districts is the indispensable measure of compliance with one person, one vote under the facts of this case.

Consider the following hypothetical. Let's say Jefferson County decided to draw districts so as to equalize the number of people in each district who *don't* own pet lizards. Let's further say that only 0.5% of Jefferson County denizens own pet lizards, and

that all of them are clustered in a single geographic area. The result of this scheme would be that the district containing the lizard-owner cluster would have more total people, and that each of these denizens' voting and representational strength would be diluted.

Now imagine that a lizard owner living in the overpopulated district brings a one person, one vote claim, arguing that the choice to exclude lizard owners from the population base is a "choice the Constitution forbids" because it amounts to arbitrary discrimination. Under Defendants' theory, that challenge would be doomed because, even assuming that total population (including lizard owners) were used as a population base, the total deviation would be far less than 10%. This is not a convincing argument—the basis of the challenge is that the chosen population base makes no sense, not that the lines have been drawn in a discriminatory way. The safe harbor rule is designed to be used when a challenge is brought to the way district lines are drawn, not when a challenge is brought to what population is equalized within a set of district lines.

Second, the safe harbor rule was not designed to be used in a factual situation such as this one. As Judge Posner has noted about the safe harbor rule, "[r]ules are attractive devices for economizing on litigation costs and minimizing judicial discretion; and

safe harbors are particularly welcome to the bar. But a rule applied to circumstances remote from those contemplated when it was adopted can produce perverse results." *Forest Cty.*, 336 F.3d at 572–73. In *Forest County*, it was the plaintiffs rather than the defendants who sought to use the safe harbor rule to their advantage, but the underlying error was similar: the safe harbor rule was designed to be used for relatively *large* districts, not small districts. For districts of the size at issue in this case, blocks of nonvoters as found in a prison may greatly distort the rough equivalence between total population and voter population that the Supreme Court presumed existed, and which did in fact exist, in its early one person, one vote cases. *See Daly*, 93 F.3d at 1223. To mechanically apply the rule in this case would be to ignore this dramatic difference in factual scenarios.

The safe harbor rule is simply not very relevant to this case. If Plaintiffs can show that, under the facts of this case, including the JCI inmates in the population base is "a choice the Constitution forbids," then they are entitled to relief.

### B. Representational Nexus

The two doctrinal paths outlined above in Part III.E lead to the same point. An apportionment base for a given legislative body

cannot be chosen so that a large number of nonvoters who also lack a meaningful representational nexus with that body[20] are packed into a small subset of legislative districts. Doing so impermissibly dilutes the voting *and* representational strength of denizens in other districts and violates the Equal Protection Clause.

For Plaintiffs to prevail in this case, they have to show that the JCI inmates comprise a (1) large number of (2) nonvoters who (3) lack a meaningful representational nexus with the Boards, and that they're (4) packed into a small subset of legislative districts. Elements (2) and (4) are undisputed. I'll get to element (1) later. The crux of this case is whether Plaintiffs have shown that the JCI inmates lack a meaningful representational nexus with the Boards.

I'll answer this question by examining three types of facts. First and most important is the evidence in the record—the adjudicative facts. This includes a number of stipulated facts, some depositions, two expert reports, and a large number of state laws

---

[20] Or, equivalently, a large number of nonvoters whose representational nexus with the legislative body is substantially different—different in kind, not just degree—from the typical person present in the legislative body's jurisdiction. The question is whether the population at issue is similarly situated in any relevant way to the typical denizens and/or voters of the jurisdiction with respect to the legislative body.

and regulations of which I can take judicial notice. Second are what might be termed "legislative facts." By that I mean "proposition[s] about the state of the world, as opposed to . . . proposition[s] about these litigants." *Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014).

These two types of evidence clearly show that the JCI inmates lack any meaningful representational nexus with the Boards, and there's no need from a purely legal standpoint to go any further. But my conclusion is bolstered—and in some sense brought to life—by examining what are sometimes called background facts; that is, "facts . . . designed to increase the reader's understanding of a case by placing the adjudicative facts in an illuminating context." Richard A. Posner, Reflections on Judging 137 (2013). These facts, while insufficient on their own to support the finding that the JCI inmates lack a meaningful representational nexus with the Boards, help ground this finding in the context of the real world.

### 1. *The Record*

A review of the record leads inexorably to three interrelated factual conclusions. First, the conditions of confinement for the inmates at JCI are almost entirely determined by policies set at the

state level and by prison officials acting under state law. Second, most of the inmates at JCI have very little meaningful opportunity to engage with members of the nonincarcerated public, and those who are allowed to engage with the public must do so under conditions prescribed by prison officials. Third, the District 3 representatives on the Boards have not, as a matter of fact, made any meaningful effort to engage with prisoners.

JCI is run by its warden "subject to the orders, policies, and regulations established" by DOC. § 944.14, Fla. Stat. (2015).[21] Its operations are also controlled by Florida statutory law, which prescribes everything from the areas in which prisoners can smoke, *id.* § 944.115, to the conditions under which restraints may be used on a pregnant prisoner, *id.* § 944.241.[22] For the most part, however, the Florida Legislature has delegated to DOC the job of regulating state prisons like JCI. Florida law states that "[DOC] shall have supervisory and protective care, custody, and control of the in-

---

[21] Laws passed by the Florida Legislature and the regulations promulgated pursuant to those laws are proper subjects of judicial notice to the extent they're adjudicative facts. *See, e.g.*, *United States v. City of Miami*, 664 F.2d 435, 443 n.16 (5th Cir. 1981).

[22] JCI only houses males, so this probably doesn't come up that often.

mates, buildings, grounds, property, and all other matters pertaining to . . . adult correctional institutions." *Id.* § 945.025(1). Pursuant to the authority granted to it, DOC has adopted regulations governing everything from inmate grievance procedures, *see* Fla. Admin. Code Ch. 33-103, to the provision of food services in state prisons, *id.* Ch. 33-204, to the provision of dental services, *id.* R. 33-402.101.

The deposition testimony of JCI's warden confirms that the conditions of JCI inmates' confinement are largely determined by prison officials, state-level administrators, and state legislators. Inmates' mail—outgoing and in some cases incoming—is reviewed by prison officials. ECF No. 48-1, at 14–15. Prison officials, acting pursuant to DOC regulations, decide who can visit inmates and under what conditions those visits may take place. *Id.* at 17–18. When inmates are allowed to leave the prison for some reason (death in the family, court appearance, etc.), they are wellsupervised for the duration of their release and are thoroughly searched upon returning. *Id.* at 22–30.

In addition to having their prison environment largely controlled by prison officials and state-level actors, JCI inmates are mostly isolated from the outside world. Most prisoners at JCI are

on close or medium confinement,[23] which means that they generally cannot leave the institution. *Id.* at 78–79. JCI must therefore be a world unto itself, separated from the rest of the county and self-reliant. JCI (through a private contractor) provides most medical services for prisoners "in-house." *Id.* at 80. JCI has its own library and law library. *Id.* at 79. JCI has its own water system and its own sewage treatment system, ECF No. 45, at 2 ¶¶ 4, 6. When there is a need for law enforcement to investigate an incident at JCI, the Inspector General's Office—not local law enforcement—typically is the first to respond. ECF No. 48-1, at 82.

It's true that some JCI inmates work outside the prison and therefore have slightly more of a connection to the community. *Id.* at 32–47, 52–57, 61–65, 73–75. But even these inmates largely operate in a bubble, prohibited from interacting with members of the community (aside from the county or City of Monticello employees supervising them) and heavily regulated in their movements. *See*

---

[23] The Warden "guessed" that the percentage of prisoners on community or minimum confinement was 15–20%, which would put the percentage on close or medium confinement at 80–85%. *See* ECF No. 48-1, at 79.

*id.* at 40–43. The Warden made clear that an inmate working outside JCI "shouldn't approach [a citizen] and communicate with a citizen." *Id.* at 63.

It's also true that the prison is not *completely* divorced from the county. If there is a medical emergency, officials at the prison will call 911, which will in turn cause Jefferson County Fire & Rescue to send an ambulance to the prison.[24] *Id.* at 48; 80–81. Similarly, JCI will call 911 for a fire. *Id.* at 49. JCI has an agreement with Jefferson County to carry off its trash. *Id.* at 46. Numerous organizations—religious groups such as churches, mostly—come to JCI and work with or minister to inmates. *Id.* at 60–61.

On the whole, though, the record bears out Plaintiffs' contention that "JCI inmates are not true constituents in Jefferson County." ECF No. 48, at 8. The JCI inmates' isolation and the fact that state-level entities (DOC, mostly) have legal authority to alter the conditions of the inmates' confinement combine to render the Boards impotent to meaningfully affect inmates' lives. The Boards can't directly regulate the lives of inmates because any such regulations would be preempted to the extent they conflicted with state

---

[24] Of course, the ambulance would take the inmate to a hospital in Leon County. ECF No. 48-1, at 80.

law. *See Tallahassee Mem'l Reg'l Med. Ctr., Inc. v. Tallahassee Med. Ctr., Inc.*, 681 So. 2d 826, 831–32 (Fla. 1st DCA 1996) (discussing preemption).

Nor can the Boards meaningfully affect the lives of inmates indirectly by the economic and social policy decisions they make at the county level. If the Board of Commissioners decides to exercise its powers under Florida law to "[p]rovide and operate . . . public transportation systems" or "license and regulate taxis,"[25] these choices will have next to no effect on inmates. The same is true of most decisions regarding zoning, infrastructure, and the like—the inmates' isolation from the rest of Jefferson County means that the policy choices made by the Board of Commissioners affect the inmates substantially less than they affect the denizens of District 3. This is even more true of the School Board, which has far more limited powers than the Board of Commissioners.[26] *See generally* §§ 1001.41–.42, Fla. Stat. (2015).

---

[25] *See* § 125.01(1), Fla. Stat. (2015). This section sets out a long list of the "powers and duties" of county governments.

[26] As mentioned above in Part I.A, each of the members of the School Board "serve[s] as the representative of the entire [county], rather than as the representative of" the district from which he was elected. § 1001.363, Fla. Stat. (2015). This means that the representational strength of any denizen vis-à-vis the School Board is not affected by the size of the district in which he lives,

This is not to say that some of the decisions of the Boards won't have incidental effects on the JCI inmates. For instance, if the Board of Commissioners decides to make efforts to help small businesses in the community, the effect may be to make visiting Jefferson County more pleasant, which might in turn make it more likely for inmates' family members to come visit them at JCI. But there is little doubt that the inmates stand in a different position vis-à-vis the Boards than do the denizens of District 3.

The record also shows that the District 3 representatives (and the Boards as a whole) have made very little effort to engage with the inmates at JCI. The warden stated that he has no discussions with any County Commissioner "regarding issues related to inmates," ECF No. 48-1, at 49, and that he also can't recall any County Commissioners or School Board members meeting one-on-one with any inmates, *id.* at 18–19. District 3 County Commissioner Hines Boyd stated that "[a]bout the only opportunity we have to interact with the inmates directly would be maybe when we see them on work crews." ECF No. 48-7, at 16. Boyd described

---

making the inclusion of the JCI inmates in District 3's population utterly un-justifiable on representational equality grounds. The parties don't bring this up, and at any rate it doesn't alter the result, so I'll assume that each School Board member represents his district alone.

touring the prison and meeting with officials and employees at the prison, but it appears that the occasion for many of those meetings was the threatened closure of JCI. *Id.* at 16–19. That closure would have had a negative impact on the employees at JCI, *id.* at 18–19—many of whom presumably live in Jefferson County—so Boyd's increased interest in the prison at the time of its threatened closure makes perfect sense. Boyd was responding to the needs of his constituents—the employees at JCI. Shirley Washington, the School Board member from District 3, has visited the prison, but not in her "School Board capacity." ECF No. 48-9, at 32.

### 2. *"Propositions About the State of the World"*

The record facts reveal that JCI is a state-run island inside Jefferson County, and that its inmates are mostly immune to the policy choices made at the county level. This is entirely consistent with general observations made by other courts about prisoners and their relationship with the communities surrounding their prisons. In *Fletcher v. Lamone*, for instance, the court addressed an argument that it was improper for a state to adjust census data to account for prisoners without also adjusting for college students and members of the military. 831 F. Supp. 2d at 896. The court

rejected this argument in part because "college students and military personnel have the liberty to interact with members of the surrounding community and to engage fully in civic life. In this sense, both groups have a much more substantial connection to, and effect on, the communities where they reside than do prisoners." *Id.*

The broader point—one so obvious it's properly termed a legislative fact—is that prisoners are isolated from society. Indeed, this is one of the *purposes* of incarceration. *See, e.g.*, Donald Braman, *Punishment and Accountability: Understanding and Reforming Criminal Sanctions in America*, 53 UCLA L. Rev. 1143, 1174–75 (2006). Moreover, prisoners are subject to control by the authority operating the institution in which they are incarcerated. *See United States v. McQueen*, 727 F.3d 1144, 1158 (11th Cir. 2013) (noting that "[p]rison inmates serve their sentences under the pervasive control of the corrections staff"). These two facts together make state prisons into de facto islands of state control.

This is in contrast to other situations in which people live on an "island" under the legal control of some superior level of government. Consider *Evans v. Cornman*, a case in which the Su-

preme Court considered whether Maryland could deny the franchise to people living on the grounds of the National Institutes of Health ("NIH"), a federal enclave in the state. 398 U.S. 419, 419–20 (1970). The Court, in addressing the question of whether the people living in the enclave were among those "primarily or substantially interested in or affected by electoral decisions" made at the state and local levels, identified a number of ways in which such decisions would affect NIH residents:

> [Residents of the federal enclave] are as concerned with state spending and taxing decisions as other Maryland residents, for Congress has permitted the States to levy and collect their income, gasoline, sales, and use taxes—the major sources of state revenues—on federal enclaves. . . . State unemployment laws and workmen's compensation laws likewise apply to persons who live and work in federal areas. . . . [NIH residents] are required to register their automobiles in Maryland and obtain drivers' permits and license plates from the State; they are subject to the process and jurisdiction of State courts; they themselves can resort to those courts in divorce and child adoption proceedings; and they send their children to Maryland public schools.

*Id.* at 424. In other words, the residents of the NIH enclave would necessarily come into contact with the machinery of state government in the course of living their lives. As the Court put it, "[i]n their day-to-day affairs, residents of the NIH grounds are just as

interested in and connected with electoral decisions . . . as are their neighbors who live off the enclave." *Id.* at 426. The same cannot be said of the JCI inmates and the Boards.

### 3. *"Outside the Record"*

In some sense, the question of whether there's a representational nexus between the JCI inmates and the Boards is really a question of whether the JCI inmates could reasonably be considered part of the political community of District 3. The facts discussed above—adjudicative and legislative—give an emphatic "no" answer to that question. The correctness of that answer is confirmed by looking at two sources outside the record.

The first source is really a compilation of sources that together shed light on whether prisoners are commonly *perceived* as belonging to the community. Note first that Florida law uses some variant of the phrase "reentry into the community" in numerous places when discussing state prisoners. *See, e.g.*, § 944.705, Fla. Stat. (2015). This suggests that inmates are *not* part of the surrounding community while incarcerated (otherwise there would be no "reentry"). Indeed, Florida even has an *alternative* to incarceration called "community control," defined as "a form of intensive, supervised custody *in the community*, including surveillance on

weekends and holidays, administered by officers with restricted caseloads. Community control is an individualized program in which the freedom of an offender is restricted *within the community, home, or noninstitutional residential placement* and specific sanctions are imposed and enforced." *Id.* § 948.001(3) (emphasis added). Numerous other sources similarly speak of the prison as being something separate and apart from the community. *See, e.g.*, Timothy Hughes & Doris James Wilson, Bureau of Justice Statistics, U.S. Dep't of Justice, *Reentry Trends in the United States* (Aug. 20, 2003), http://www.bjs.gov/content/pub/pdf/reentry.pdf. The fact that Florida legislators (and many others) appear to consider being in the community and being incarcerated as two distinct and mutually exclusive states does not, by itself, prove anything. But it is completely consistent with (and therefore reinforces) the JCI-specific facts in the record, the observations of numerous courts considering the nature of incarceration generally, and, frankly, common sense.

The second "outside the record" source that confirms that JCI inmates are not properly considered part of the political community vis-à-vis the Boards is the publicly-available information about the Boards' activities. The minutes, agendas, etc. from the

Boards' meeting are available online,[27] which makes it possible to get a sense of what the Boards *actually* do. An examination of the agendas of some the Board of County Commissioners' recent meetings gives a flavor of its activities. Consider the Board's August 4, 2015 meeting. *See* Minutes of Regular Session, Jefferson Cty. Bd. of Cty. Comm'rs (Aug. 4, 2015). After the call to order, invocation, etc. the Board considered the following matters (among others): whether to issue a small grant to a private Christian school, *id.* at 2; the ongoing process of designating two properties in the county as brownfield sites, *id.*; and whether to approve a bid for a sidewalk construction project (it was approved), *id.*

Two weeks later, following what appears to have been a lively debate, the Board passed a resolution banning the practice of hydraulic fracturing ("fracking"). *See* Minutes of Regular Session, Jefferson Cty. Bd. of Cty. Comm'rs 1–2 (Aug. 18, 2015). The Board also voted to keep the millage rate at 8.3 mills, *id.* at 2, and discussed (with input from at least one Jefferson County denizen) concerns about the size of the Sheriff's Office budget, *id.* at 2–3.[28]

---

[27] *See BOCC Records*, Jefferson County Clerk of Court, http://www.jeffersonclerk.com/bocc-records.aspx (last visited Mar. 11, 2016).

[28] None of this is mentioned to diminish the importance of the Board of Commissioners. The Board has "broad authority to enact 'county ordinances

Later, in November 2015, the Board voted to install stairs at a local park and approved a new library director. *See* Minutes of Regular Session, Jefferson Cty. Bd. of Cty. Comm'rs 2 (Nov. 3, 2015). Two citizens spoke about items not on the agenda—one "expressed his concerns about government spending" and the other "stated his concerns that log trucks traveling in Wacissa and Waukeenah were speeding and putting citizens in danger" and "asked the Board to consider additional signage and/or speed bumps." *Id.* at 1.

Would some of these discussions have been of possible interest to JCI inmates? Certainly—fracking, for instance, could conceivably affect the water supply at JCI.[29] But most of the matters dealt with at the meetings would have little, if any, practical effect on JCI inmates. The meeting minutes tend to confirm that the Board of Commissioners' power does not penetrate the walls of

---

not inconsistent with general or special law.'" *Tallahassee Med. Ctr.*, 681 So. 2d at 831 (quoting what is now Fla. Const. art. VIII, § 1(f).). Undoubtedly the Board's policy decisions are of great moment to the denizens of Jefferson County, as evidenced by the spirited debates recounted in the minutes of the Board's meetings.

[29] *See* EPA, Draft Assessment of the Potential Impacts of Hydraulic Fracturing for Oil and Gas on Drinking Water Resources: Executive Summary ES-6 (June 2015) ("From our assessment, we conclude there are above and below ground mechanisms by which hydraulic fracturing activities have the potential to impact drinking water resources.")

JCI, and that the inmates, while they're physically located in Jefferson County, are effectively living in a state-run enclave.

### 4. JCI Inmates Lack a Meaningful Representational Nexus With the Boards

To summarize, the inmates at JCI are isolated from the surrounding community and subject to the control of DOC and the state. The Boards possess little legal authority or practical ability to substantially affect the JCI inmates' lives through their policies. The District 3 representatives, and the Boards as a whole, appear to have made very little, if any, effort to solicit the input of JCI inmates. All of this is completely consistent with the general proposition that prisoners go on with their lives mostly separated from the communities in which their facilities happen to be located.

Given these facts, it's clear that the inmates lack a meaningful representational nexus with the District 3 representatives and with the Boards as a whole. It is difficult to see how the District 3 representatives "represent" the inmates in the same way they represent others who are physically located in District 3. The representatives can't really make policy decisions that would affect the inmates. The representatives *could*, of course, discuss issues of concern to the inmates during meetings and informally with other

members of the Boards, but to what end? The proper target of such concerns in the vast majority of situations would be prison officials or state legislators. Given the nature of the inmates' incarceration and the fact that DOC already has a comprehensive grievance system in place, it is unclear how the District 3 representatives could function as ombudspersons to inmates. Finally, any government benefits "brought home" by the representatives would likely be unavailable to the inmates because of their isolation from the community and the limits placed on their liberty.

Defendants nonetheless claim that the JCI inmates are properly counted as part of the political community and that they have a representational nexus with the Boards. ECF No. 46, at 10–11. Defendants point out a number of ways in which the Boards act, directly or indirectly, to affect the lives of JCI inmates, but they basically boil down to three arguments: (1) the county provides emergency medical (ambulance), fire, and waste pickup services to JCI, ECF No. 46, at 3–7; (2) local government officials (including members of the Boards) can and have met with JCI offi-

cials "acting on behalf of" inmates, *id.* at 3–4; and (3) local govern-
ment officials and/or members of the community occasionally in-
teract with inmates, *id.* at 4–6.[30]

These arguments are unpersuasive. The first argument is
true as far as it goes—JCI *is* served by Jefferson County Fire &
Rescue, *see* ECF No. 47-7, at 8–9—but it doesn't really help De-
fendants much. The question isn't whether the JCI inmates have
*any* connection to the governing bodies of Jefferson County, but
rather whether they have a substantial enough connection to plau-
sibly be considered denizens on the same footing as the denizens
of District 3. Having access to emergency medical and fire services
doesn't establish such a connection. The second argument fails be-
cause (1) it appears that local officials have met with prison offi-
cials quite infrequently, and (2) local officials have not met with
prison officials to discuss the welfare of *inmates*, but rather to dis-
cuss how the prison affects the local economy—that is, how it af-
fects nonincarcerated persons in the county. *See* ECF No. 48-1, at

---

[30] Defendants also advance an argument that goes like this: the Boards
"vote on budgets that impact the quality of education in the public schools in
Jefferson County," which then affects the quality of the labor pool, which then
affects the "quality of correctional officers selected from that pool," which then
affects prisoners' lives. ECF No. 36, at 7.  This argument fails.  A rubber band
won't stretch that far without snapping.

66–67; ECF No. 48-7, at 17–19. The third argument fails because, as discussed earlier, the direct interactions between inmates and local officials have been so minimal as to be nearly nonexistent.

There are two anecdotes recounted by the District 3 representatives during their depositions that are in some ways more telling than anything else in the record. Hines Boyd, who has been the County Commissioner for District 3 for over seven years, was asked at his deposition about a statement in his affidavit that he had received letters from JCI inmates "on occasion."

> Q. Okay. Now, you state in this affidavit that you can't recall the subject of those letters. But sitting here today, do you recall the subject matter of those inmate letters?
>
> A. No. There was nothing that I could help any of those prisoners with that they asked for. So I just opened the letter, and I read it and set it aside.
>
> Q. Did you ever respond to any of those letters?
>
> A. No, I did not.

ECF No. 48-7, at 21. It's not surprising that Boyd couldn't help the inmates writing to him—he doesn't really represent them.

Shirley Washington, the School Board member from District 3, was asked about her relationship with the inmates at JCI. She

stated that she had gone to the prison as a community member rather than as a public official and interacted with inmates on a few occasions. ECF No. 48-9, at 32. Ms. Washington lamented the "condition" of the inmates' confinement, confessing that her "first visit [to JCI] was quite tearful." *Id.* Plaintiffs' lawyer asked her to elaborate:

> Q. Can you tell me what you mean by "condition?"
>
> A. Well, the way they were living, having two in one cell. I mean, their freedom is gone.
>
> Q. Okay. So we're talking about their housing situation?
>
> A. Yes.
> . . .
> Q. Okay. Did you do anything after that visit to address the housing condition for those inmates?
>
> A. There was nothing I can do there about that, because they have administrators and other folks to take care of that. That would have been certainly out of my lane.
> . . .
> Q. . . . . [D]id you believe that as a School Board member, there was anything you could do to improve their conditions, their housing conditions that you witnessed?
>
> A. No, no.

*Id.* at 32–34.

These are anecdotes, and do not by themselves *prove* anything about the JCI inmates' representational nexus with the Boards. But they certainly support the conclusion—arrived at after considering other facts in the record and certain "legislative facts" about the nature of incarceration—that the JCI inmates cannot reasonably be considered to be denizens in the same way as other people living in Jefferson County.[31]

### C. The Constitutionality of the County's Districting Scheme

*1. Size of Deviations*

The inmates at JCI lack a meaningful representational nexus with the Boards. They are situated differently with respect to the Boards than other people in Jefferson County—the true denizens of the County—in every way that matters for representative democracy.  Treating them alike makes little if any sense. The question becomes whether there's enough cognizable harm to the representational and voting rights of those living in other districts

---

[31] What about JCI inmates who were residents of Jefferson County pre-incarceration? They are more likely to have a representational nexus with the Boards, and should perhaps be counted. Plaintiffs suggest that there are nine such people, but a closer look reveals that there are nine inmates who were *convicted* in Jefferson County. ECF No. 30-1, at 52. It's unclear whether all or some or none of these inmates were actually residents of Jefferson County. At any rate, the number is so small that accidentally excluding some of these inmates from the count would not appreciably dilute anyone's voting or representational rights.

to strike down the scheme as violative of one person, one vote. In other words, is the inmate population large enough that counting it dilutes these rights?

In some sense, the size of the inmate population shouldn't matter. The "arbitrary discrimination" doctrinal path discussed earlier suggests that *any* population arbitrarily included in a population base, no matter how small, works an unconstitutional dilution of others' rights.

But there's no need to go that far—in this case, the inmate population is relatively large, and its inclusion quite clearly denies the denizens of Districts 1, 2, 4, and 5 equal protection of the laws by diluting both their representational and voting strength.[32] The true denizen population of District 3 is about two-thirds the denizen population of the other districts, giving each denizen in District 3 one-and-a-half times the representational strength of the

---

[32] Plaintiffs contend that the overall population deviation once the JCI inmates are excluded is above the 10% "safe harbor" threshold, and that Defendants have failed to provide a justification for such a large deviation. ECF No. 30, at 15–17. This argument, much like Defendants' safe harbor argument, assumes the result it wants this Court to reach in drawing its conclusion. Whether the JCI inmates should be excluded when drawing districts is precisely the question this Court must answer, and pointing out the deviations that result when they are not counted does little to address that question.

denizens of other districts and. Assuming there are no large pock-
ets of nonvoters in Jefferson County aside from the JCI inmates,
the disparity in denizen population also gives the voters in District
3 about one-and-a-half times the voting strength of the voters in
other districts. This is clearly an equal protection violation.

Viewed another way, the total deviation of 42.63% that re-
sults from not counting the prisoners is simply too large to be ig-
nored. The safe harbor rule, while inapplicable to this case, does at
least provide a rough guide to how large deviations in the relevant
numbers across districts must be for there to be no doubt that un-
lawful dilution has taken place. That threshold—10%—is crossed
here, with room to spare.

### 2. Defendants' Justifications

As discussed at length already, the typical safe harbor/bur-
den-shifting framework used in one person, one vote cases really
has no applicability to this case. Defendants nonetheless offer
what amount to "justifications" for the large total deviation that
results when prisoners are excluded from the population base. One
such justification is that the districting plan "serves the goal of
promoting representational equality." ECF No. 46, at 8. It doesn't.

Another argument—one not framed as a justification, but

one that nonetheless sounds like a justification—is that Florida law required the Boards to count the prisoners. ECF No. 24, at 12–13. That may or may not be true; the legal advice the Boards received was certainly to that effect. If it is true, though, it's no justification—state law must yield when it leads to a result that conflicts with the mandates of the U.S. Constitution. *See, e.g.*, *Felder v. Casey*, 487 U.S. 131, 138 (1988). To the extent Defendants are arguing that their good-faith belief that they were required to count the prisoners is a justification, they are mistaken. *See Raske v. Martinez*, 876 F.2d 1496, 1502 (11th Cir. 1989) ("The federal courts recognize no doctrine of 'constitutional mistake' that can absolve a legislature from the consequences of a misapprehension concerning a statute's constitutionality.")

### D. The Special Circumstances of this Case (Or, the Not-So-Slippery Slope)

Defendants have predictably made a "slippery slope" argument. They warn that "should th[is] Court enter the arena of determining which individuals are worthy of being included in an entity's population data, it should not be unexpected that arguments to exclude other segments of the population will shortly follow. Policy arguments exist to exclude resident aliens and minors, or to

give more weight to areas that have a high concentration of eligible voters, such as areas with high concentrations of the elderly as opposed to younger families with children. This Court should not wade into these political judgments." ECF No. 36, at 8–9.

I am convinced that the slope ahead is not so slippery. There are three key features of this case that make it special. First is the fact that we are dealing with prisoners. Prisoners are not like minors, or resident aliens, or children—they are separated from the rest of society and mostly unable to participate in civic life. Second, and perhaps more importantly, we are dealing with *state* prisoners and a *county* government. It is the interplay of the limited powers of the county government, the fact that the prisoners are under state control, and the fact that the prisoners are confined that deprives the prisoners of a meaningful representational nexus with the county government. Third, the size of the prison population relative to the size of the districts is such that counting the prisoners makes a substantial difference. This would not be the case in in counties with larger populations.

If *any* of these features were not present, this would be a different case. In particular, the situation would be quite different if we were dealing with a *state* legislative district, because state

prisoners are obviously affected by the policies put in place at the state level. When Mr. Boyd received letters from JCI inmates, he put those letters aside because there was nothing he could do for them in his capacity as a County Commissioner. The same would not be true of the state senator and representative whose territory includes JCI.

### E. A Closing Thought

Defendants maintain that concluding that the JCI inmates cannot be counted for purposes of drawing districts for the Boards is "a policy determination as to [the] political equality of a certain segment of the population, a determination that [c]ourts have explicitly refused to make." ECF No. 36, at 2 n.2. It is certainly true that the Supreme Court has made it clear that, as a general proposition, states get to decide—usually through legislative processes—"who counts" for purposes of state and local districting. The Court has also made clear, however, that federal courts have an important role to play in protecting individual rights, and that is precisely what this Court is doing.

But to say that this Court is merely protecting the rights of the denizens of Districts 1, 2, 4, and 5 in making this decision is slightly disingenuous. My decision rests on the fact that there is

no meaningful representational nexus between the Boards and the inmates at JCI—that is, there is nothing gained, constitutionally speaking, by including JCI inmates in the population base. This is the essential difference between this case and a case like *Garza* in which the population whose inclusion was at issue clearly possessed representational rights that would be impaired if the population was not included in the population base. The lack of a representational nexus itself turns in large part on the fact that the JCI inmates live sharply circumscribed lives. The fact is that the JCI inmates *do not* have "political equality" with the other denizens of Jefferson County vis-à-vis the Boards—not in terms of voting, of course, but also not in terms of representation.

That lack of political equality is not a consequence of my decision, but a factual predicate of it. In short, *I* have not decided that the JCI inmates lack political equality with their "neighbors" in Jefferson County—the State of Florida has. Florida has explicitly deprived the JCI inmates of their voting rights, *see* § 944.292(1), Fla. Stat. (2015), and it has implicitly deprived them of their representational rights, at least with respect to units of local government. That the deprivation is implicit makes it no less a deprivation.

## F. Remedy

"When a federal court declares an existing apportionment scheme unconstitutional, it is . . . appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). Despite the fact that this is an election year, I'm confident that the Boards can quickly devise a plan that does not impermissibly dilute the voting and representational strength of the denizens of Jefferson County. Plaintiffs have submitted what they term an "illustrative plan," and their expert claims that this plan meets all constitutional and statutory requirements. ECF No. 30-1, at 14–17. This could perhaps be a starting point for the Boards—or perhaps not.

Whatever they choose to do, the Boards must act relatively quickly. If they "do not respond, or the imminence of [the] . . . election makes it impractical for them to do so, it [will] become[] the 'unwelcome obligation'" of this Court to devise an interim districting plan. *See Lipscomb*, 437 U.S. at 540.

## V.   CONCLUSION

Defendants argue vigorously that excluding the JCI inmates from the population base for districting purposes would be "arbitrary." ECF No. 46, at 8; ECF No. 36, at 7–8. The opposite is true—including them in the population base is arbitrary. The inmates at JCI, unlike aliens, children, etc. living in Jefferson County, are not meaningfully affected by the decisions of the Boards. To say they are "constituents" of the Board representatives from District 3 is to diminish the term constituent. To treat the inmates the same as actual constituents makes no sense under any theory of one person, one vote, and indeed under any theory of representative democracy. Furthermore, such treatment greatly dilutes the voting and representational strength of denizens in other districts. Jefferson County's districting scheme for its Board of County Commissioners and School Board therefore violates the Equal Protection Clause.

Accordingly,

**IT IS ORDERED:**

1.   Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 30, is **GRANTED**. Defendants' Joint Motion for Summary Judgment, ECF No. 24, is **DENIED**.

2.      Defendants are enjoined from using the current districting plan for the Jefferson County Board of County Commissioners and the Jefferson County School Board.

3.      Defendants must submit to this Court **on or before Monday, April 4, 2016** a proposed districting plan that complies with this Order and with all applicable federal and state laws, to the extent those state laws are compatible with federal law.

**SO ORDERED on March 19, 2016.**

<u>**s/Mark E. Walker**</u>
**United States District Judge**